UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

IN RE:

BERNARD AND ANDREA TEW                                    CHAPTER 11
                                                  CASE NO. 20-51078

DEBTORS

---

**SECOND AMENDED DISCLOSURE STATEMENT FOR DEBTORS'
PLAN OF REORGANIZATION UNDER CHAPTER 11
OF THE UNITED STATES BANKRUPTCY CODE**

---

Respectfully submitted,

DELCOTTO LAW GROUP PLLC

 /s/Dean A. Langdon, Esq.
KY Bar No. 40104
200 North Upper Street
Lexington, Kentucky  40507
Telephone:  (859) 231-5800
Facsimile:  (859) 281-1179
dlangdon@dlgfirm.com
COUNSEL FOR DEBTORS


Dated: March 31, 2021

# <u>TABLE OF CONTENTS</u>

| <u>Section</u> | <u>Title</u> | <u>Page</u> |
|---|---|---|

I.  PRELIMINARY STATEMENTS AND DISCLAIMERS ...................................1
  1.1  Introduction.................................................................................................1
  1.2  Debtors' Preliminary Statement..................................................................2
  1.3  Disclaimers .................................................................................................2

II.  NOTICES AND DEADLINES.......................................................................3
  2.1  Voting Deadline...........................................................................................3
  2.2  Date of Confirmation Hearing ....................................................................3
  2.3  Deadline to Object to Confirmation of the Plan .........................................4
  2.4  Deadline to Object to Claims.......................................................................4
  2.5  Requests for Copies of Disclosure Statement and Plan ..............................4

III.  GENERAL INFORMATION ABOUT THE DEBTORS .......................................4
  3.1  Debtors' Background, Description of Debtors' Business, and Principal Factors Leading to the Chapter 11 Bankruptcy Filing................................4
  3.2  Debtors' Prepetition Assets and Liabilities.................................................5
  3.3  Debtors' Postpetition Liabilities ……………………………………………6
  3.4  Prepetition Litigation Involving the Debtors  ............................................6

IV.  COMMENCEMENT AND PROGRESS OF THE CHAPTER 11 CASE………..7

  4.1  Commencement of Case and Joint Administration ………………………7
  4.2  Retention of Professionals………………………………………………8
  4.3  Appointment of Subchapter V Trustee and Striking of Subchapter V Election……………………………………………………8
  4.4  Chapter 11 Operating Order………………………………………………8
  4.5  Cash Collateral/Adequate Protection……………………………………..8
  4.6  Operations During Bankruptcy……………………………………………8
  4.7  Plan Formulation Process…………………………………………………8

V  OVERVIEW OF THE DEBTORS' PLAN OF REORGANIZATION……………9

  5.1  General Summary .......................................................................................9
  5.2  Debtors' Recommendation .........................................................................9
  5.3  Description of Certain Key Plan Terms......................................................9
  5.4  General Summary of Plan Treatment of Unclassified Claims...................12
  5.5  General Summary of Plan Treatment of Classified Claims......................13
  5.6  Plan Implementation ................................................................................18

VI.       RISK FACTORS ........................................................................................21
     6.1    Risks of Non-Confirmation ............................................................21
     6.2    Risks of Non-Consensual Confirmation .......................................21
     6.3    Risks of Delays in Confirmation...................................................22

VII.     PLAN CONFIRMATION ......................................................................22
     7.1    Generally.......................................................................................22
     7.2    Voting Requirements for Confirmation under the Bankruptcy Code ........23
     7.3    General Requirements for Confirmation under the Bankruptcy Code ......25
     7.4    Confirmation .................................................................................26
     7.5    Alternatives to Confirmation .......................................................27

VIII.    CERTAIN FEDERAL TAX CONSEQUENCES .................................28
     8.1    General..........................................................................................28
     8.2    Tax Consequences of Payment of Allowed Claims
            Pursuant to Plan Generally............................................................29
     8.3    Certain U.S. Federal Income Tax Consequences to the Debtors ..............30

IX.      ADDITIONAL INFORMATION, RECOMMENDATIONS,
     AND CONCLUSION ...........................................................................31
     9.1    Additional Information .................................................................31
     9.2    Recommendations and Conclusion...............................................31

**EXHIBIT A** – Consent Judgment
**EXHIBIT B** – Prepetition Litigation
**EXHIBIT C** – ADR Arbitrage article
**EXHIBIT D** – Revenue Projections
**EXHIBIT E** -- Contingent, Disputed and/or Unliquidated Claims
**EXHIBIT F** – Resume of Dr. Tew
**EXHIBIT G** – 2017 Financial Statements for retirement accounts
**EXHIBIT H** – Positive Performance Swap Agreement
**EXHIBIT I** – ADR Arbitrage Funds Flow diagram
**EXHIBIT J** – Test Trades
**EXHIBIT K** – Golden Isles Bank Statement
**EXHIBIT L** – Liquidation Analysis

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

IN RE:

BERNARD AND ANDREA TEW                                      CHAPTER 11
                                                           CASE NO. 20-51078

        DEBTORS

---

**SECOND AMENDED DISCLOSURE STATEMENT FOR DEBTORS'
PLAN OF REORGANIZATION UNDER CHAPTER 11
OF THE UNITED STATES BANKRUPTCY CODE**

---

        Come Bernard V. Tew and Andrea B. Tew (the "Debtors") in this bankruptcy case, and
pursuant to 11 U.S.C. § 1125 and Fed. R. Bankr. P. 3016, submit the following Amended
Disclosure Statement (the "Disclosure Statement") to provide holders of Claims against and
Interests in the Debtors with adequate information in order to allow them to make an informed
decision regarding their rights to vote on the Debtors' Plan of Reorganization (the "Plan") filed
contemporaneously herewith.

## <u>ARTICLE I</u>

### PRELIMINARY STATEMENTS AND DISCLAIMERS

        1.1     **<u>Introduction.</u>**  The Debtors are seeking approval of their Plan of Reorganization.
The confirmation of a plan is the overriding purpose of a Chapter 11 case.  Although referred to
as a "plan of reorganization," a plan may provide for anything from a complex restructuring of a
debtors' obligations to a simple liquidation of assets.  In either event, upon confirmation of a plan,
the plan becomes binding on the debtor and all of its creditors and other parties in interest, and the
obligations owed by the debtor to those parties are substituted for those outlined in the confirmed
plan.  In this Bankruptcy Case, the Plan contemplates a resumption of debt service payments to
secured creditors consistent with the Debtors' earning capacity, along with a process for resolving
the substantial disputed claims held by SKAT and others. The Debtors expect this will maximize
the ultimate recoveries for all Creditors.

        To assist all known Creditors, Interest Holders, and other parties in interest of the Debtors
with their review of the Plan, the Debtors provide this Disclosure Statement for the purpose of
disclosing all information the Debtors deem material, important, and necessary to the parties'
ability to make a reasonably informed decision regarding their rights and to vote on the Plan.  By
an Order of the United States Bankruptcy Court for the Eastern District of Kentucky entered on
_____ __, 2021 [ECF No. ___], this Disclosure Statement has been approved as
containing "adequate information" in accordance with 11 U.S.C. § 1125.  The Bankruptcy Code
defines "adequate information" as "information of a kind, and in sufficient detail, as far as is

1

reasonably practicable in light of the nature and the history of the debtor and the condition of the debtor's books and records . . . that would enable . . . a hypothetical investor of the relevant class to make an informed judgment about the plan . . . ." 11 U.S.C. § 1125(a)(1).

*All Creditors, Interest Holders, and Parties in Interest are encouraged to read and carefully consider this entire Disclosure Statement and to refer to the Plan during their review.* THE PROVISIONS CONTAINED IN THE PLAN CONTROL OVER ANY STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

1.2    **Debtors' Preliminary Statement.**  The Debtors believe that the Plan is in the best interests of all Creditors.  As a Creditor, your vote on the Plan is important.  All Creditors entitled to vote are urged to vote in favor of the Plan.  A summary of the voting instructions is set forth in Section 7.2 below, and more detailed instructions are contained on the ballots distributed to each Creditor entitled to vote on the Plan.  *For your vote to be counted, your ballot **must** be duly completed, executed, and received by 5:00 p.m. Eastern Time, on _____ 2021* (the "Voting Deadline"), unless the Voting Deadline has been extended by the Debtors or the Court in writing prior to that time.

The Plan will be confirmed by the Bankruptcy Court if it is accepted by the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Creditors' Claims in each class voting on the Plan.  However, the Debtors have the right under 11 U.S.C. § 1129(b) to ask for approval of the Plan even though a class or classes reject the Plan, if the Bankruptcy Court finds that the Plan provides fair and equitable treatment for the rejecting class.

1.3    **Disclaimers.**

1.3.1    **Legal Effect of Statements in this Document.**  The information contained in this Disclosure Statement—including, but not limited to, the information regarding the Debtors' background, the Debtors' financial information, and the Debtors' liquidation analysis—is included solely for the limited purpose of soliciting acceptances of the Plan.  This information shall not be construed as an admission of any fact or liability, stipulation, or waiver by the Debtors in any contested matter, adversary proceeding, or other action or threatened action involving the Debtors, but rather as statements made in the course of settlement negotiations.  Further, this information shall not be admissible in any non-bankruptcy proceeding involving the Debtors, nor shall it be construed to be conclusive advice on the tax or other legal effects of the Plan as to Creditors of the Debtors; provided, however, that in the event that the Debtors default under the Plan, the Disclosure Statement may be admissible in a proceeding relating to such default for the purpose of establishing the existence of such default.

1.3.2    **No Other Representations Authorized.**  All representations in this Disclosure Statement are those of the Debtors, and no one else is authorized by the Debtors to give any additional information or to make any representations beyond those in this Disclosure Statement, the Plan, and the exhibits attached thereto, incorporated by reference, or referred to herein.  If any such information is given or representations are made, such information or representations *may not be relied upon* as having been authorized by the Debtors.  Further, any

representations or inducements made to secure acceptance of the Plan which are *other than* as contained in this Disclosure Statement ***should not be relied upon*** by any person.

       1.3.3  **No Involvement of Independent Public Accountant.**  To the Debtors' knowledge, no information contained in this Disclosure Statement has been prepared by an independent public accountant, except as specifically noted.

       1.3.4  **Forward-Looking Statements**.  This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the Debtors using financial information and other information available to them through their books and records and in reliance on information prepared and maintained by the Debtors.  The valuations placed upon Assets are based upon their best estimate of values.  The Debtors have not obtained any formal appraisals of any of their Assets.  The words "believe," "may," "estimate," "continue," "anticipate," "intend," "expect," and similar expressions identify these forward-looking statements. Forward-looking statements have a number of risks, uncertainties, and assumptions, including those described in Article VI.  Accordingly, the forward-looking events and circumstances discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward-looking statements.  The Debtors may, but have no obligation to, publicly update or revise any forward-looking statements, whether as a result of new information, future events, or otherwise.

       *Neither the Plan nor this Disclosure Statement attempt to forecast consequences which follow from a general rejection of the Plan, although an attempt is made later to state the consequences of a liquidation of the Debtors' assets.*

       1.3.5  **Effect of Representation by Counsel.**  The Debtors are represented by the law firm of DelCotto Law Group PLLC, 200 North Upper Street, Lexington, Kentucky 40507. DelCotto Law Group has not expressed an opinion on any information set forth herein and has no actual knowledge of any information that would conflict with any information contained in the Plan or in this Disclosure Statement.

## ARTICLE II

### NOTICES AND DEADLINES

       2.1  **Voting Deadline.**  For your vote to accept or reject the Plan to be counted, you must:  (1) complete all required information on the ballot; (2) execute the ballot; and (3) return the completed ballot to the Debtors' counsel at DelCotto Law Group PLLC, c/o Tresine Callahan, 200 North Upper Street, Lexington, Kentucky 40507 so that it is ***received by 5:00 p.m., Eastern Time, on the Voting Deadline, _____, 2021***.  Any failure to follow the voting instructions included with the ballot or to return a properly completed ballot so that it is received by the Voting Deadline may disqualify your ballot and your vote.

       2.2  **Date of Confirmation Hearing.**  A hearing to consider the confirmation of the Plan will be held before the United States Bankruptcy Court for the Eastern District of Kentucky, 100 East Vine Street, Second Floor, Lexington, Kentucky 40507, on _____, 2021 at the

hour of _____, Eastern Time. [ADD TELEPHONIC INFO IF NECESSARY] Parties are not required to attend the confirmation hearing but may do so if they wish. Attendance at the Confirmation Hearing does not include the ability to vote, so you are urged to fill in, date, sign, and promptly return your ballot to the Debtors' counsel by the Voting Deadline.

2.3    **Deadline to Object to Confirmation of the Plan.**    Objections, if any, to confirmation of the Plan must:  (a) be in writing; (b) state the name and address of the objecting party and the nature of the Claim or Interest of the party; (c) state with particularity the basis and nature of any objection; and (d) be filed with the Court and served so that they are ***received no later than 5:00 p.m., Eastern Time, on _____, 2021*** by the U.S. Trustee and the Debtors' counsel.

2.4    **Deadline to Object to Claims.**  Unless otherwise ordered by the Bankruptcy Court, all objections to Claims, including determinations regarding the secured status of any claim, shall be filed on or before one hundred and twenty (120) days following the Effective Date, or forty five (45) days following the filing of any Claim, whichever is later (the "Claim Objection Bar Date"), without prejudice to the extension of such period upon proper application therefor.  The objecting party shall serve a copy of each such objection upon the holder of the Claim in accordance with Fed. R. Bankr. P. 3007.  Under the Plan, any Claim for which a timely objection is not filed shall be deemed Allowed as filed or scheduled.

2.5    **Requests for Copies of Disclosure Statement and Plan.**  Requests for copies of the Disclosure Statement and the Plan by parties in interest may be made in writing to the Debtors' counsel by mail at DelCotto Law Group PLLC, c/o Tresine Callahan, 200 North Upper Street, Lexington, Kentucky 40507, or by email to tcallahan@dlgfirm.com.  Please call Ms. Callahan at (859) 231-5800 with any questions.

## **ARTICLE III**

## **GENERAL INFORMATION ABOUT THE DEBTORS**

3.1    **Debtors' Background, Description of Debtors' Business, and Principal Factors Leading to Chapter 11 Filing.**

The Tews are husband and wife who reside in Woodford County, Kentucky.  Dr. Tew is an investment advisor who unfortunately agreed to assist George Hofmeister and entities operated by him in managing various ERISA-covered retirement plans. Mr. Hofmeister was ultimately convicted of criminal conduct in connection with the ERISA-covered retirement plans.  Dr. Tew was not charged criminally but was a defendant in several civil enforcement actions related to the Hofmeister retirement plans. Pursuant to a Consent Judgment (the "Consent Judgment") entered by the United States District Court for the Eastern District of Kentucky on July 8, 2015 Dr. Tew[1] was enjoined from serving as a fiduciary or service provider to any ERISA-covered employee benefit plan, except for plans where he and relatives were the participants. A true copy of the

---

[1] The Consent Judgment also applied to two closely-held entities: Tew Enterprises, LLC and Bluegrass Investment Management, LLC.

Consent Judgment is attached to this Disclosure Statement as **Exhibit A**.  Dr. Tew is able to manage and advise ERISA-covered retirement plans where the only participants are relatives, as well as non-ERISA retirement accounts for third parties.[2] Dr. Tew continued to manage family retirement plans after the Consent Judgment and the returns from his individual Roth IRA (a beneficiary of the family retirement plan) provided sufficient income to service the Tews' debts.

However, in 2018 Dr. Tew was named as a defendant in numerous lawsuits which are included in a federal multidistrict litigation styled In re Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) Tax Refund Scheme Litigation, Case No. 18-md-2865 (the "SKAT Litigation") currently pending in the United States District Court for the Southern District of New York. No determination of liability has been made in the SKAT Litigation, and Dr. Tew vigorously denies any liability in the suits to which he is a party. However, the SKAT Litigation includes allegations of fraud in connection with the submission of refund requests for taxes withheld on foreign stock dividends. Those unfounded allegations of fraud resulted in Dr. Tew being unable to obtain direct trading ability in stock markets, harming his ability to earn income. Dr. Tew has since endeavored to engage a trading brokerage in order to continue managing his own family's retirement plans.

Dr. Tew is the majority limited partner of Tew LP, a Kentucky limited partnership which was formed on November 2, 2000. The general partner is SV Holdings, LLC, a Kentucky limited liability company. In addition to Dr. Tew, the limited partners consist of individuals or entities connected to the Tew family.

Tew LP owns and operates a 60-acre farm in Woodford County, Kentucky, and also owns several thoroughbred horses. Certain horses were in the possession of a third-party trainer when the case was filed but have been returned to the possession of Tew LP. The Debtors' farm is subject to mortgages in favor of Traditional Bank and Central Bank and is adjacent to a 30-acre parcel and home where the Tews live. The Tew home is subject to at least 3 mortgages: a) Wilmington Savings Fund Society, FSB as Trustee; b) LSC 2020 LLC, successor to Truist Bank; and c) Central Bank.  As a result of the restrictions on Dr. Tew's ability to earn income, the Debtors fell into default on these mortgages (and other obligations), and the farm and their home were scheduled to be sold simultaneously via foreclosure sale on July 24, 2020.

In order to preserve the value of the farm and Debtors' business operations and assets for the benefit of all the Debtors' creditors, the Debtors elected to seek relief under the Bankruptcy Code.

3.2    **Debtors' Prepetition Assets and Liabilities.**  The following subsections provide a summary of the Debtors' primary Assets and Liabilities according to the Debtors' books and records and their Bankruptcy Schedules.  This summary does *not* take into consideration all of the Proofs of Claim filed herein.  The Asset values are based on the Debtors' best estimates of market values, historic book values on the Petition Date, or as determined by professional analyses, and

---

[2] A description of the difference between ERISA-covered retirement accounts and non-covered retirements accounts may be found here: https://www.investopedia.com/ask/answers/09/erisa-coverage.asp (last visited March 12, 2021).

may *not*, and in all likelihood *do not*, accurately reflect liquidation values or what value may ultimately be obtained for these Assets.[3]   ***Holders of Claims are encouraged to review the Schedules, and any amendments thereto, for a complete listing of the Debtors' Assets and Liabilities.***

        3.2.1   **Prepetition Assets.**   As of the Petition Date, the Debtors estimated the approximate fair market values of their respective prepetition Assets as follows:

| | | |
|---|---|---:|
| Real property | $ | 3,601,800.00 |
| Vehicles | $ | 37,443.00 |
| Personal/Household Goods | $ | 114,635.00 |
| Financial Assets | $ | 18,547.38 |
| Business-Related Property | $ | 18,000.00 |
| TOTAL | $ | 3,790,425.38 |

This valuation does not include retirement plan investments and claims related to the SKAT litigation, all of which were listed with an "unknown" value in the bankruptcy schedules. This valuation does not take into account factors such as whether or not a greater value might be obtained if the real property owned by the Debtors and Tew LP were sold together rather than separately. For more specific information about the Debtors' prepetition Assets, see the Debtors' Schedules [ECF No. 40] filed in the Bankruptcy Case.

        3.2.2   **Overview of Total Prepetition Liabilities.**   As of the Petition Date, the Debtors' prepetition liabilities totaled approximately $42,793,224.00, which consists of: (a) secured claims totaling approximately $3,365,354.79 and (b) unsecured claims totaling approximately $39,427,869.21.   For more specific information about the Debtors' prepetition Liabilities, see the Debtors' Schedules [ECF No. 40] filed in the Bankruptcy Case, along with any amendments filed.  Also see the proofs of claim filed by certain parties in interest.

    3.3   **Debtors' Postpetition Liabilities.**

        3.3.1   **Professional Fees.**

        (a)   **DelCotto Law Group PLLC.**   As set forth more fully in Section 4.2.1 below, the Debtors were authorized to employ DelCotto Law Group PLLC ("DLG") as its counsel in the Bankruptcy Case.  Prior to the filing, DLG received the sum of $1,750.00 which was applied to the filing fee and held the remaining sum of $33.00 in escrow on the Petition Date.  As of February 28, 2021, the Debtors had incurred post-petition professional fees and expenses in the amount of $48,293.78, subject to allowance of such fees by the Court.

        (b)   **Golden Law Office PLLC**.  The Debtors were authorized to employ Golden Law Office PLLC ("Golden Law") as special litigation counsel to continue their representation of the Debtors in the insurance litigation.  [ECF No. 81].  The prepetition

---

[3] *See* Section 7.3.1 of this Disclosure Statement and **Exhibit L** attached hereto for the Debtor's Liquidation Analysis.

engagement agreement between Golden Law and the Debtors provides Golden law was employed on a 45% contingency fee basis. This fee agreement was approved by the Bankruptcy Court. The insurance litigation is still pending.

       3.3.2 **Potential Administrative Claims.** In addition to administrative claims incurred in the ordinary course of business, the Debtors may have liability for claims arising under 11 U.S.C. § 503(b) for the actual and necessary costs and expenses of preserving the estate. However, the Debtors do not believe any such claims exist as they have paid their ongoing living expenses in the ordinary course during the pendency of this case.

    3.4   **Prepetition Litigation Involving the Debtors.** As of the Petition Date, the Debtors were involved in the SKAT Litigation, two consolidated foreclosure actions and two declaratory judgment actions involving insurance litigation. A list of those actions is attached hereto as **Exhibit B**.

## ARTICLE IV

## COMMENCEMENT AND PROGRESS OF THE CHAPTER 11 CASE

    4.1   **Commencement of Case and Joint Administration.**

       4.1.1   **Petition Date.** On July 23, 2020, the Debtors filed a voluntary petition for relief under Chapter 11, Subchapter V, of the Bankruptcy Code, commencing its Bankruptcy Case.

       4.1.2   **Chapter 11, Subchapter V, Operating Order.** On July 23, 2020, the Bankruptcy Court entered a Chapter 11 Operating Order for Subchapter V Cases in the Debtors' Bankruptcy Case evidencing that the Debtors had requested and been granted relief pursuant to subchapter V of Chapter 11 of the Bankruptcy Code and had thereby become Debtors in Possession. [ECF No. 7]. On September 11, 2020, the United States Trustee filed his Objection to the Debtors' designation as subchapter V debtors [ECF No. 52]. On September 30, 2020 the Court entered an Order Striking Debtors' Subchapter V Election [ECF No. 83]. On September 7, 2020 the Debtors filed an Amended Petition, evidencing their intention to proceed as Chapter 11 debtors without any designated subcategory [ECF No. 87].

       4.1.3   **Joint Administration.** On August 11, 2020, the Court entered an Order granting the request of Debtors' and Tew LP to jointly administer their bankruptcy case under the lead case of Bernard and Andrea Tew, Case No. 20-51708 [ECF No. 32]. However, in light of the Order Striking Debtors' Subchapter V Election the Court entered an Order [ECF No. 89] on October 8, 2020 seeking input from the Debtors whether or not joint administration should be vacated. On October 13, 2020 the Debtors filed their Position Statement, Motion to Terminate Joint Administration and Motion to Modify Notice Procedures [ECF No. 94], which was granted by Order entered on October 15, 2020 [ECF No. 97]. Accordingly, this case has proceeded separately from the case of Tew LP since mid-October 2020.

4.2    **Retention of Professionals.**

    4.2.1    **Retention of Debtors' Counsel.**  Pursuant to the Interim Order entered on August 18, 2020 [ECF No. 38], and the Final Order entered on August 25, 2020 [ECF No. 43], the Debtors were authorized to employ the law firm of DelCotto Law Group PLLC as their counsel in the Bankruptcy Case, effective as of the Petition Date.

    4.2.2    **Retention of Golden Law Office PLLC.**  Pursuant to the Order entered on September 30, 2020 [ECF No. 81] the Debtors were authorized to employ Golden Law Office PLLC ("Golden Law") as special litigation counsel to continue their representation of the Debtors in the insurance litigation on a contingent basis.

4.3    **Appointment of Subchapter V Trustee and Striking of Subchapter V Election.** This case was originally filed as a Chapter 11, Subchapter V, Case, and therefore the Honorable Charity S. Bird was appointed as the Subchapter V Trustee on July 24, 2020 [ECF No. 12].  Ms. Bird served as the Case Trustee through September 30, 2020 at which time she was relieved of her duties when the Court issued an Order Striking Debtors' Subchapter V Election [ECF No. 83]. Ms. Bird's request for compensation in the total amount of $3,728.50 in professional fees was approved by this Court on December 7, 2020 [ECF No. 127] and is currently an administrative expense of the Debtors' Estate.

4.4    **Chapter 11 Operating Order.**  With the Subchapter V election stricken, the court issued a Chapter 11 Operating Order on October 8, 2020 [ECF No. 91].

4.5    **Cash Collateral/Adequate Protection.**  On September 3, 2020 the Debtors filed their Motion to Define Scope and Authorize the use of Cash Collateral, and to Expedite Hearing thereon (the "Cash Collateral Motion") [ECF No. 50]. Numerous parties objected, and on September 17, 2020 the Court entered an Order Continuing Hearing, Authorizing the Use of Cash Collateral and Expediting Hearing Thereon [ECF No. 64]. After a continued hearing held on September 30, 2020, the Court entered an Order [ECF No. 82] finalizing the Debtors authority to use cash collateral, but denying the additional relief sought.

4.6    **Operations During Bankruptcy.**    The Debtors' financial performance is set forth in the monthly operating reports which are filed with the Court [ECF Nos. 66, 110, 126, 129 and 137]. These monthly reports include profit and loss and bank statements, as well as a listing of the Debtors' receipts and disbursements, accounts payable and accounts receivable. The monthly operating reports do not reflect any earnings in the Debtors' retirement accounts. Dr. Tew's ability to generate revenue by managing the Tew family retirement plans has been impacted by the COVID-19 pandemic and the intricacy of the investment methods to be used.

4.7    **Plan Formulation Process**.  Following the internal formulation of its Plan of reorganization, the Debtors have communicated with its major secured lenders.  The Debtors have discussed concepts for its Plan with these parties and others in advance of its filing.

    The Debtors have worked diligently to prepare a plan of reorganization that is feasible, fair and equitable among all of its Creditors and parties in interest.  The Debtors submit that the Plan

filed with the Court and attached hereto represents the product of these efforts and provides the best possible recovery for all Creditors.

## ARTICLE V

## OVERVIEW OF THE DEBTORS' PLAN OF REORGANIZATION

5.1    **General Summary**.  The Plan contemplates reliance upon Mrs. Tews' income and Dr. Tews' social security to pay ordinary living expenses, while Dr. Tew will oversee the use of his Roth IRA and family Roth IRAs through a pension group trust to engage in a swap agreement in connection with ADR arbitrage. A description the ADR arbitrage process issued by J.P. Morgan is attached as **Exhibit C**. The Roth IRAs are beneficiaries of the pension group trust, which permits trading in foreign securities, a critical aspect of ADR arbitrage. Additional information about this process is located in Section 5.6.2 of this Disclosure Statement. A revenue projection for calendar 2021 is attached as **Exhibit D**. The Debtors will seek to modify their secured debts to the extent possible or mutually agreed and resume regular payments thereon. The Debtors will establish an escrow account to be funded with regular payments to pay unclassified and unsecured claims. The Debtors expect numerous claim objections will be needed to resolve contingent, unliquidated and disputed claims.

5.2    **Debtors' Recommendation.**  The Debtors believe that the Plan is in the best interests of all of its constituencies and will permit the maximum recovery possible for all classes of Claims, greater than any possible recovery in a Chapter 7 or other liquidation setting.

5.3    **Description of Certain Key Plan Terms.**    The Debtors provide this general summary and description of what they believe to be certain of the key terms of the Plan.  This is not a full and complete description of everything contained in the Plan, only of various general and specific Plan provisions. THE PLAN AND THE EXACT LANGUAGE THEREIN CONTROL OVER THIS GENERAL DESCRIPTION AND SHOULD BE REVIEWED CAREFULLY.

5.3.1    **Continued Existence of the Debtors**.  The Plan provides for the Debtors to continue to operate post-Confirmation as the "Reorganized Debtors" in the ordinary course of business, receiving ongoing income from Dr. Tews' arbitrage income and Mrs. Tews' employment income.

5.3.2    **Funding the Plan.**  The Reorganized Debtors will fund the Plan payments to Creditors in the ordinary course and according to the Plan treatment terms from post-Confirmation Disposable Income. The Debtors may, in their sole discretion, sell a portion or substantially all of their assets free and clear of liens, claims and interests after confirmation of the Plan if they determine that it will be in the best interest of their Creditors, provided that any surviving liens against assets sold after Plan confirmation will attach to the proceeds of such a sale to the same extent and priority as set forth in this Plan.

5.3.3    **Vesting of the Debtors' Assets.**   At the Confirmation Date, all Assets of the Debtors and their Estate, including all Avoidance Actions and Causes of Action (if any), will

revest in and remain with the Reorganized Debtors, free and clear of all liens, claims, interests, and encumbrances, except for those liens specifically provided for in the Plan. The Reorganized Debtors and their Assets will remain subject to the jurisdiction of this Court until the Bankruptcy Case is closed or dismissed.

5.3.4   **Post-Confirmation Liabilities.**   The Reorganized Debtors will not have any liability for the Debtors' obligations which existed on the Petition Date, except those expressly assumed and/or addressed under the Plan. The Reorganized Debtors will be responsible for all ongoing expenses and payments due and owing or contemplated under the Plan.

5.3.5   **Injunctions.**   Except as may be otherwise provided in the Confirmation Order, entry of the Confirmation Order shall also act as an injunction against any Person taking any action to commence or continue any action, employ any process, or act to collect, offset, recoup or recover any claim or cause of action satisfied, released or discharged under this Plan to the fullest extent authorized or provided by the Bankruptcy Code, including to the fullest extent provided by Sections 524 and 1141 thereof. From and after the Confirmation Date, there shall be in place with regard to the Assets and any Claims, an injunction to the same extent and with the same effect as the stay imposed by Section 362 of the Bankruptcy Code and such injunction will remain in effect until the Debtors have completed Plan payments to Class 7 Unsecured Creditors. Except as provided in this Plan or as expressly approved in writing by the Reorganized Debtors, all Claimants shall be precluded and enjoined from asserting against the Reorganized Debtors, their Estate, or the Reorganized Debtors' Assets, any other or further Claim based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date, whether or not the Claimant filed a proof of claim.

5.3.6   **Discharge of Claims.**   The Plan provides that the payments, distributions, and other treatment provided in respect to each Claim in the Plan shall be in complete satisfaction of such Claim and said Claim shall be discharged in accordance with the provisions of 11 U.S.C. § 1141. The Confirmation Order shall provide for the future discharge the Debtors from all Claims and other debts that arose before the Confirmation Date, whether or not: (i) a Claim based on such debt is allowed pursuant to 11 U.S.C. § 502, or (ii) the holder of a Claim based on such debt has accepted the Plan, upon completion of all Plan payments.

5.3.7   **Objections to Claims.**   Unless otherwise ordered by the Bankruptcy Court, all objections to Claims, including determinations regarding the priority/type of any Claim, shall be filed on or before one hundred and twenty (120) days following the Effective Date, or forty-five (45) days following the filing of any Claim, whichever is later, without prejudice to the extension of such period upon proper application therefor.

5.3.8   **Valuation of Secured Claims.**   Under 11 U.S.C. § 506, a secured creditor has a "secured claim" to the extent of such creditor's interest in a Debtors' interest in collateral, and an unsecured claim for the balance, if any. The "allowed" amount of the creditor's secured claim will be the lesser of value of the creditor's interest in the Debtors' interest in the property as determined under 11 U.S.C. § 506, or the allowed amount of the creditor's claim. Under the Plan, if any dispute over valuation occurs with any Secured Creditor, the Debtors reserve the right to request that the Court determine the value of the Creditor's interest in the collateral that secures

10

the Creditor's Claim. More information about the Debtors' proposed valuation of claims of Secured Creditors may be found in the portion of the Plan which classifies claims.

### 5.3.9   **Executory Contracts and Unexpired Leases.**

(a) **Generally.** Under the Plan, the Debtors reserve the right to apply to the Court at any time prior to Confirmation for authority to assume, assign, or reject any Executory Contracts and Unexpired Leases not expressly addressed in the Plan in whole or in part as provided in 11 U.S.C. §§ 365 and 1123. The Plan further provides that all remaining Executory Contracts and Unexpired Leases for which the Debtors have not so moved on or before the Confirmation Date shall be deemed rejected as of said date (the "Rejection Date"); provided, however, that any such motions, requests, proceedings, or actions to assume or reject, or to determine Allowed Cure Claims, pending at the Confirmation Date shall be continued until determined by Final Order of the Bankruptcy Court. The Debtors do not believe they are a party to any executory contracts.

(b) **Bar Date for Rejection Damages Claims.** The Plan provides that any proof of claim that any third party has with respect to the rejection of any Unexpired Lease or Executory Contract must be filed no later than thirty (30) days after the later of: (i) entry of a Final Order of this Court authorizing such rejection, or (ii) the Rejection Date. Any such Claim for rejection damages shall be treated as a Class 7 Unsecured Claim.

(c) **Allowed Cure Claims on Assumed Unexpired Leases and Executory Contracts**. If the Debtors apply for and receive the Court's authorization to assume an Unexpired Lease or Executory Contract as provided under 11 U.S.C. § 365, other than those Unexpired Leases and Executory Contract specifically addressed in the Plan, the Plan provides that the counterparty under any such Lease or Executory Contract shall have thirty (30) days to seek allowance of a Cure Claim from the Bankruptcy Court, provided that the Court has not already entered an order specifying the Cure Claim terms. If no such allowance of a Cure Claim is sought within that time period, all such Claims shall be barred. However, if a Cure Claim is timely sought and thereafter allowed by the Court, the Plan requires that the Debtors will then consult with the Claimant to negotiate a repayment of the Allowed Cure Claim over a reasonable period.

### 5.3.10   **Causes of Action.** The Plan provides that at the Confirmation Date, all Assets of the Debtors and their Estate, including all Avoidance Actions or other Causes of Action (if any), will revest in and remain with the Reorganized Debtors. The Debtors have conducted a preliminary analysis of potential Avoidance Actions and has determined that the sums transferred were minimal, that transferees appear to have valid defenses and most transfers appear to have been in the ordinary course of business. However, the Debtors reserve their right to bring such an Avoidance Action or other Cause of Action (if any) prior to or following the Confirmation Date if it subsequently determines otherwise.

5.4    **General Summary of Plan Treatment of Unclassified Claims.** *The Plan provisions control over the following generalized summary.*

5.4.1    **Administrative Claims.**

(a)    **Ordinary Course Administrative Claims.** The Plan provides that all Allowed Administrative Claims arising from obligations incurred by the Debtors in the ordinary course of its business prior to the Confirmation Date, including Administrative Trade Claims, will be paid and performed by the Reorganized Debtors in the ordinary course of business in accordance with the terms of any agreements governing, instruments evidencing, or other documents relating to such transactions. The Debtors believe that all "ordinary course" Claims are generally current.

(b)    **Other Allowed Administrative Claims.** The Plan states that all other holders of Allowed Administrative Claims, including, but not limited to Professional Claims and Allowed Claims under 11 U.S.C. § 503(b)(9), if any, shall be paid in full within thirty (30) days of the Effective Date or as agreed by any such Creditor. The Plan provides that Professionals shall retain any escrow funds in their possession to pay against their Allowed Claims. At present, the Debtors do not anticipate that there will be any other Allowed Administrative Claims, beyond those Allowed Administrative Claims for Professional fees and expenses for Debtors' counsel, and that after allowance and application of escrowed funds, the balance owed will be paid from the proceeds of an exit loan within 30 days after the Effective Date.

5.4.2    **Bar Date for Administrative Claims.** The Plan provides certain time deadlines for certain administrative claimants to seek application for allowance and should be closely reviewed, as any untimely-filed claim will be disallowed.

5.4.3    **Post-Confirmation Professional Claims.** Post-Confirmation Date Professional Claims will not require Bankruptcy Court approval and will be paid post-Confirmation in the ordinary course from the Reorganized Debtors' operations.

5.4.4    **United States Trustee Fees.** The Plan provides that all fees accrued and payable to the United States Trustee pursuant to 28 U.S.C. § 1930 shall be paid on or before the Effective Date of the Plan. Following Confirmation, the obligation to pay United States Trustee fees shall continue until the Bankruptcy Case is converted, dismissed, or closed, whichever occurs first, and said fees will be paid by the Reorganized Debtors in the ordinary course as they are incurred, with all fees to be paid before the Bankruptcy Case may be closed. The Reorganized Debtors shall also timely file and serve all reports required by the U.S. Trustee.

5.4.5    **Administrative Tax Claims.** Allowed Administrative Claims of a Tax Creditor shall be paid in full, plus interest thereon at the rate prescribed by 11 U.S.C. § 511 from its due date until paid, on the later of (a) the Effective Date or (b) the date on which such Allowed Claim becomes due and payable pursuant to the terms thereof.

5.4.6    **Priority Tax Claims.** Allowed Priority Tax Claims will be paid through equal deferred monthly cash payments over five (5) years from the Petition Date with interest at the rate prescribed in 11 U.S.C. § 511 until paid in full with payments commencing the month after

12

the Effective Date.  The Internal Revenue Service has filed a proof of Claim (Claim No. 9) asserting $*0* in Allowed Priority Tax Claims and Kentucky Department of Revenue has not filed a proof of Claim. The Debtors do not believe there are any unpaid Priority Tax Claims.

　　5.5　　**General Summary of Plan Treatment of Classified Claims.** *The Plan provisions control over the following generalized summary.*

　　5.5.1 **Class 1:  Allowed Secured Claim of Branch Banking & Trust Company now Truist.**  Class 1 shall consist of the Allowed Secured Claim of Branch Banking & Trust Company, now Truist ("Truist") [Claim No. 2] in the total amount of $5,911.41 as of the Petition Date, which is secured by a purchase-money lien on a 2015 Mercedes ML250 owned by the Debtors (the "Vehicle").

　　5.5.1.1 **Retention of Liens/Adequate Protection**.  Subject to any cash collateral carve-outs and adequate protection as approved by prior Orders of this Court, Truist will retain its lien on the Vehicle until paid in full as set forth herein or until the Vehicle is sold under the terms of this Plan, with the lien to attach to the proceeds of any such post-Confirmation sale, after payment of ordinary costs of sale.

　　5.5.1.2 **Future Sales of Collateral.**  Following the Effective Date, the Reorganized Debtors may elect to sell the Vehicle by a sale pursuant to 11 U.S.C. § 1123(a)(5)(D).  If the Vehicle is sold following Confirmation, the sale will be free and clear of any and all Claims, liens, interests and encumbrances.  The Truist Claim shall attach to the proceeds of such a sale in the order of priority which existed on the Effective Date and, after payment of ordinary closing costs and fees, shall be paid in that order from the net proceeds of the sale, or as the Reorganized Debtors and Truist may otherwise agree. Any surplus proceeds shall be retained by the Debtors.

　　5.5.1.3 **Payment of Class 1 Claim.**

　　　　(a)　　The sum of $5,911.41 will be the secured portion of the Truist Claim. The Class 1 Claim has been fully repaid in the ordinary course through the Debtors making monthly payments pursuant to the underlying agreement with Truist. The Class 1 Claim is Not Impaired.

　　　　(b)　　To the extent not specifically modified by the terms of this Plan, the rights and obligations of the Reorganized Debtors and Truist set forth in the loan documents underlying the Class 1 Claim shall continue in full force and effect post-Confirmation.

　　5.5.2　**Class 2:  Secured Claim of LSC 2020, LLC.**  Class 2 consists of the Secured Claim of LSC 2020, LLC ("LSC") [Claim No. 7] in the amount of $175,014.09 as of the Petition Date, which is secured by a second priority mortgage against the Debtors' Residence. LSC is the transferee of the Claim from Branch Banking & Trust Company, now Truist. See [ECF No. 104].

　　5.5.2.1 **Retention of Liens/Adequate Protection**.  Subject to any cash collateral carve-outs and adequate protection as approved by prior Orders of this Court, LSC will retain its lien on the Residence until paid in full as set forth herein or until the Residence is sold under the terms of this Plan, with the lien to attach to the proceeds of any such post-Confirmation sale, after

payment of ordinary costs of sale. LSC shall apply any adequate protection payments to the principal balance of its Claim.

   5.5.2.2 **Future Sales of Collateral.** Following the Effective Date, the Reorganized Debtors may elect to sell the Residence by a sale pursuant to 11 U.S.C. § 1123(a)(5)(D). The Debtors shall provide LSC with no less than thirty (30) days' advance notice of any proposed sale of the Residence, including the terms of sale. LSC may seek to have the Bankruptcy Court modify the proposed terms of sale, provided any hearing shall be conducted prior to the proposed closing date. Any such sale shall be free and clear of any and all Claims, liens, interests and encumbrances. The Class 2 Claim shall attach to the proceeds of such a sale in the order of priority which existed on the Effective Date and, after payment of ordinary closing costs and fees, shall be paid in that order from the net proceeds of the sale, or as the Reorganized Debtors and LSC may otherwise agree. Any surplus proceeds shall be distributed under the Plan.

   5.5.2.3 **Payment of Class 2 Claim.**

   (a) The Class 2 Claim will be repaid through regular monthly principal and interest payments, as follows: The sum of $175,014.09 will be the secured portion of the LSC Claim and will be amortized over fifteen (15) years at an annual interest rate of 5.0% and a monthly payment of $1,384.00, with the entire then-outstanding balance of the secured portion of the Class 2 Claim to become due five (5) years after the Effective Date, with no prepayment penalties. LSC shall be entitled to be paid its reasonable legal fees incurred through the Effective Date over a period of twelve (12) months after the Effective Date. Payments on the Class 2 Claim will begin on the 14th day of the first full month after the Effective Date and will continue to be come due on the 14th day of the month thereafter until the secured portion of the Class 2 Claim is paid in full. The Class 2 Claim is Impaired.

   (b) Upon written request of LSC, the Debtors will execute loan documents consistent with terms of a confirmed Plan; provided, however, that the Debtors shall not incur any fees, costs, charges or other expenses in connection with any such loan documents.

   (c) Notwithstanding anything in Section 12.12 to the contrary, the Reorganized Debtors shall have ten (10) days to cure or contest in good faith any notice of default in making the monthly payments provided for in Section 5.2.3(a). In no event shall LSC be required to send the Reorganized Debtors and their counsel of record more than two (2) notices of payment default in any twelve (12) month period, and LSC may immediately proceed with the filing of a Motion to Terminate the Automatic Stay with respect to the Residence upon the third payment default in any twelve (12) month period. After the Effective Date, all other terms and conditions in the Mortgage of Real Estate dated January 28, 2013 filed in Mortgage Book 694, Page 55, and attached to Claim 2-1 not expressly modified herein, including without limitation the timely payment of real estate taxes and maintenance of sufficient insurance for the Debtors' Residence, shall remain in full force and effect.

  5.5.3 **Class 3: Allowed Secured Claim of Central Bank & Trust Company.** Class 3 consists of the Allowed Secured Claim of Central Bank & Trust Company ("Central Bank") [Claim No. 8], in the amount of $275,600.81 as of the Petition Date. The Class 3 Claim is secured

14

by a third-priority mortgage against the Debtors' Residence.[4]  The mortgage matured prior to the Petition Date, and Central Bank obtained a personal judgment in the amount of $260,621.69 plus interest at the annual rate of 10.75% from December 27, 2019 until paid against the Debtors in the Woodford Circuit Court on February 12, 2020. The Woodford Circuit Court judgment also adjudicated the third-priority status of Central Bank's mortgage.

5.5.3.1 **Retention of Liens**.  Subject to any cash collateral carve-outs as approved by prior cash collateral Orders of this Court, Central Bank will retain its lien on the Residence until paid in full as set forth herein or until the residence is sold under the terms of this Plan, with the lien to attach to the proceeds of any such post-Confirmation sale, after payment of ordinary costs of sale.

5.5.3.2 **Future Sales of Collateral.**  Following the Effective Date, the Reorganized Debtors may elect to sell the Residence by a sale pursuant to 11 U.S.C. § 1123(a)(5)(D).  If the Residence is sold following Confirmation, the sale shall be free and clear of any and all Claims, liens, interests and encumbrances.  The Class 3 Claim shall attach to the proceeds of such a sale in the order of priority which existed on the Effective Date and, after payment of ordinary closing costs and fees, shall be paid in that order from the net proceeds of the sale, or as the Reorganized Debtors and Central Bank may otherwise agree. Any surplus proceeds shall be distributed under the Plan.

5.5.3.3 **Payment of Class 3 Claims.**

(a)    The Class 3 Claim will be repaid through regular principal and interest payments, as follows:  The sum of $275,600.81 will be the secured portion of the Central Bank Claim and will be amortized over fifteen (15) years at an annual interest rate of 5.0%. The Debtors will make monthly payments of accrued interest (approximately $930, initially) and quarterly payments of principal (approximately $2,500 initially), with the entire then-outstanding balance of the secured portion of the Class 3 Claim to become due five (5) years after the Effective Date, with no prepayment penalties.  Central Bank shall be entitled to be paid its reasonable legal fees incurred through the Effective Date, within thirty (30) days after full payment of the Class 3 Claim. Payments on the Class 3 Claim will begin on the 14th day of the first full month after the Effective Date and will continue to be come due on the 14th day of the month thereafter until the secured portion of the Class 3 Claim is paid in full.  The Debtors will not be in default under the Plan unless a payment is more than 10 days past due, and the Debtors shall have a period of 14 days after written notice of a default from Central Bank to cure any default prior to Central Bank seeking relief from the injunction provided by the Plan. The Class 3 Claim is Impaired.

(b)    Upon written request of Central Bank, the Debtors will execute loan documents consistent with terms of a confirmed Plan; provided, however, that the Debtors shall not incur any fees, costs, charges or other expenses in connection with any such loan documents.

---

[4] Central Bank also has a mortgage against an adjacent farm owned by Tew, LP.

5.5.4    **Class 4: Allowed Secured Claim of Wilmington Savings Fund Society, FSB, as trustee for Upland Mortgage Loan Trust B.**    Class 4 consists of the Allowed Secured Claim of Wilmington Savings Fund Society, FSB as trustee ("Wilmington") [Claim No. 3], in the amount of $2,606,444.59 as of the Petition Date.  The Class 4 Claim is secured by a first-priority mortgage against the Debtors' Residence.  The mortgage secures an adjustable-rate note dated February 9, 2007 in the amount of $3,000,000.00, payable to Citimortgage, Inc. The mortgage matures in 2037. On February 12, 2020 Wilmington obtained a personal judgment from the Woodford Circuit Court against the Debtors in the amount of $2,527,670.30 plus interest at an annual rate of 5.25% from May 1, 2019 until paid. Claim No. 3 provides that Wilmington's claim is in the principal amount of $2,390,309.29, bearing interest at an annual rate of 4.25%, along with accrued interest of $151,953.48, fees and costs of $20,571.34, and an escrow deficiency of $43,610.48 as of the Petition Date.

5.5.4.1 **Retention of Liens**.  Subject to any cash collateral carve-outs as approved by prior cash collateral Orders of this Court, Wilmington will retain its lien on the Debtors' Residence until paid in full as set forth herein or until the Residence is sold under the terms of this Plan, with the lien to attach to the proceeds of any such post-Confirmation sale, after payment of ordinary costs of sale.

5.5.4.2 **Future Sales of Collateral.**  Following the Effective Date, the Reorganized Debtors may elect to sell the Residence by a sale pursuant to 11 U.S.C. § 1123(a)(5)(D), provided, however that Wilmington shall retain a right to credit bid at any such sale equivalent to the rights granted by 11 U.S.C. § 363(k).  Any such sale of the Residence shall be free and clear of any and all Claims, liens, interests and encumbrances.  The Class 4 Claims shall attach to the proceeds of such a sale in the order of priority which existed on the Effective Date and, after payment of ordinary closing costs and fees, shall be paid in that order from the net proceeds of the sale, or as the Reorganized Debtors and Wilmington may otherwise agree. Any surplus proceeds shall be distributed under the Plan.

5.5.4.3 **Payment of Class 4 Claims.**

(a)    The Class 4 Claims will be repaid through regular monthly principal and interest payments, as follows:  The principal sum of $2,390,309.29 will be a part of the secured portion of the Wilmington Claim and the Debtors shall resume regular payments of principal, interest, taxes and insurance under the adjustable rate note on the 10th day of the first full month after the Effective Date.   Pre-petition principal amounts, interest, fees and the escrow deficiency owed as of the Petition Date and accruing through the Effective Date (the "Wilmington Fees") shall be paid by the Debtors in 36 equal monthly installments after the Effective Date, without interest, beginning the third month after the Effective Date. Payment of principal, interest, fees and escrow payments coming due between the Petition Date and the Effective Date are controlled by the Order regarding Relief from the Automatic Stay [ECF No. 181], the terms of which are incorporated herein by reference. Wilmington shall be entitled to include its reasonable legal fees incurred through the Effective Date in the Wilmington Fees. Payments on the Class 4 Claim will begin on the 1st day of the first full month after the Effective Date and will continue to be come due on the 1st day of the month thereafter until the secured portion of the Class 4 Claim is paid in full.  The Class 4 Claim is Impaired.

(b)    To the extent not specifically modified by the terms of this Plan, the rights and obligations of the Reorganized Debtors and Wilmington set forth in the loan documents underlying the Class 4 Claims shall continue in full force and effect post-Confirmation.

5.5.5    **Class 5: Allowed Secured Claim of Madison Street, LLC.** Class 5 consists of the Allowed Secured Claim of Madison Street, LLC ("Madison") [Claim No. 11], in the amount of $340,082.19 as of the Petition Date. The Class 5 Claim is secured by a fourth-priority mortgage against the Debtors' Residence.[5] The mortgage matured prior to the Petition Date, and Madison was named as a defendant in the foreclosure suit filed by Central Bank in Woodford Circuit Court. Pursuant to a judgment of the Woodford Circuit Court entered on February 12, 2020, it was determined that Madison held no interest in the Debtors' Residence.

5.5.5.1 **Retention of Liens/Adequate Protection**.  In light of the prior judicial determination that Madison has no interest in the Debtors' Residence, any lien or mortgage against the Debtors' Residence will be avoided and extinguished on the Confirmation Date. This provision shall not affect or modify any other liens or security interests Madison may have against Tew LP.

5.5.5.2 **Future Sales of Collateral.** Following the Effective Date, the Reorganized Debtors may elect to sell their Residence by a sale pursuant to 11 U.S.C. § 1123(a)(5)(D). Any such sale of the Residence shall be free and clear of any and all Claims, liens, interests and encumbrances.  The Class 5 Claims shall not attach to the proceeds of such a sale. Any surplus proceeds shall be distributed under the Plan.

5.5.5.3 **Payment of Class 5 Claim.**  The Class 5 Claim will be repaid pro-rata as a Class 7 unsecured creditor. The Class 5 Claim is Impaired.

5.5.6    **Class 6: Allowed Other Secured Claims.** Class 6 shall consist of all other Secured Claims, if any, excluding the Class 1 - 5 Secured Claims.  The Plan provides that, in satisfaction of the Allowed Secured Claim of any Class 6 Claimant, if any, the Debtors shall, on the Effective Date, or such other date as may be agreed on, at the Debtors' option, either: (i) surrender the collateral to the Claimant to allow it to liquidate said collateral at its discretion; or (ii) pay the amount of such Allowed Secured Claim to the Class 6 Creditor over time during the life of the Plan.  Any Allowed Deficiency Claim shall be treated as a Class 7 Claim.  The Class 6 Claims are not Impaired.  There are no known claims in this Class.

5.5.7.    **Class 7:  Allowed Unsecured Claims.**  Except as otherwise set forth herein, after payment of all Allowed Administrative and Priority Claims, the Plan provides that each holder of an Allowed Claim in Class 7 shall receive Distribution(s) to the greatest extent possible from the Disposable Income of the Reorganized Debtors for a period of 36 months following the Effective Date. Estimated Disposable Income is set forth on the Debtor's financial projections, which are attached as **Exhibit D**. Allowed Unsecured Claims do not include any unknown, contingent, disputed or unliquidated Claims which are addressed in Class 8. Within 30 days of the Effective Date, the Plan requires that the Reorganized Debtors establish a separate escrow account to be used solely for funding Distributions to Class 7 Claimants (the "Class 7 Escrow").  Beginning

---

[5] Madison also has a lien against a thoroughbred horse owned by Tew, LP.

thirty (30) days after the Effective Date and continuing for 36 months, the Reorganized Debtors shall deposit into the Class 7 Escrow the sum of at least $3,000.00 per quarter for 12 quarters for the purposes of paying Class 7 Allowed Unsecured Claims. In addition, the Debtors shall deposit their Disposable Income generated during each calendar quarter for 12 quarters after the Effective Date into the Class 7 Escrow, to be distributed pursuant to the Plan. The Reorganized Debtors shall make Distributions from the Class 7 Escrow to each holder of an Allowed Class 7 Claim annually, beginning on June 1, 2022 and ending on June 1, 2025, in the amount of each Claimant's *pro rata* share of the Class 7 Escrow on that date, subject to the provisions for resolution of Class 8 Claims set forth below.  The Class 7 Claims are Impaired.

5.5.8 **Class 8: Contingent, Unliquidated or Disputed Claims.** The Debtors have compiled a list of Claims scheduled as contingent, unliquidated or disputed which is attached as **Exhibit E**. The Debtors have and will continue to engage in good faith negotiations with holders of contingent, unliquidated or disputed claims to resolve them on a consensual basis. The Debtors' initial proposed treatment of each claim is reflected on **Exhibit E** however, the Debtors retain all rights to formally object to any claim identified on **Exhibit E**. If, and to the extent a contingent, unliquidated or disputed claim becomes an Allowed Claim, it shall become a Class 7 Allowed Claim, entitled to a pro-rata distribution as a Class 7 Claimant. The Debtors will not make any disbursements from the Class 7 Escrow until such time as all contingent, unliquidated or disputed claims have been finally Allowed or Disallowed. The Class 8 Claims are Impaired.

5.6 **Plan Implementation**

5.6.1 **Parties Responsible for Implementation of the Plan.** Dr. and Mrs. Tew will be the parties responsible for implementation of the Plan. The Reorganized Debtors will pay all United States Trustee fees and will file all post-Confirmation reports required by the United States Trustee's Office.  The Reorganized Debtors will also file the necessary final reports and will request closing the Bankruptcy Case as soon as practicable after Plan payments have begun.

5.6.2 **Means of Implementation.** Upon Confirmation, the Plan provides that Mrs. Tew's income will continue to be used to pay the ordinary living expenses of the Reorganized Debtors to the greatest extent possible, and that Dr. Tew will make contributions from investment profits in his Roth IRA account to fund the payments to Creditors proposed by the Plan, as well as to operate the business of Tew LP.

Dr. Tew has had a lengthy and profitable career in the financial services industry. A copy of Dr. Tews' resume is attached as **Exhibit F**.  Although the Consent Judgment imposed some limits on Dr. Tews' ability to generate revenue, he is able to manage retirement group trusts whose beneficiaries are limited to family members. After the Consent Judgment Dr. Tew began to search for a prime broker to establish family retirement accounts. He identified a broker (OneTradeX) in the Cayman Islands. It took more than 1 year to establish these accounts, establish the trading structure and verify the ability to trade. Trades were done during late 2016, 2017, and January of 2018. Compilation balance sheets and income statements for the Tew family pension group trusts for the year ending December 31, 2017 are cumulatively attached as **Exhibit G**, reflecting the income generated for each group trust. However, when the SKAT Litigation began in Kentucky, the trades which generated revenue for the Tew family retirement accounts were halted by all

countries in Europe. This resulted in the closing of the OneTradeX firm.  Because of the allegations of fraud against Dr. Tew contained in the SKAT Litigation, all subsequent efforts to directly enlist a broker have been denied.  Accordingly, Dr. Tew determined that enlisting licensed traders who will transact trades with a broker and rely on Dr. Tews' knowledge in exchange for a portion of revenues earned was the best method to resume use of the Tew family retirement accounts to generate revenue.

Since the Debtors' retirement accounts are Roth IRAs, earnings of the IRAs are not taxed. However, if an IRA engages in activities other than investments, it may be subject to Unrelated Business Taxable Income ("UBTI") liability. The IRAs may avoid liability for UBTI by using naked short sales or entering into a swap agreement. The Debtors' Roth IRAs (and those of his family members) are in a pre-existing pension group trust known as Golden Isles Industrial Pension Group Trust ("Golden Isles Industrial"). Dr. Tews' Roth IRA is an 80% beneficiary of Golden Isles Industrial, while five other family members are 4% beneficiaries. Prior to the Petition Date, Golden Isles Industrial purchased a Positive Performance Swap (the "Swap Agreement") with Golden Isles Technology Pension Group Trust ("Golden Isles Technology"). A true copy of the Swap Agreement is attached as **Exhibit H**. The Swap Agreement enables Golden Isles Industrial to benefit from ADR arbitrage and the issuance and cancellation process for ORD (local jurisdiction) shares and ADRs (US only shares) to generate revenue (the "Arbitrage Process"). Moreover, the revenue generated under the Swap Agreement is not based on the value of the assets in the IRAs but will result from the use of capital belonging to the brokerage, which will receive a portion of the profits generated as compensation for use of its capital. Dr. Tew created and supervised a similar Arbitrage Process while at New York Life and is intimately familiar with all aspects of the process. The gist of the Arbitrage Process is that substantial sums of money can be generated based on short-term differences in price arising from local market times, conditions and currency valuations between an ORD share on a foreign market and an ADR traded exclusively on the US market. See **Exhibit C**.  The Arbitrage Process is low risk because the trading software will set buy and sell limits on the purchase and sale of ADRs and ORDs so that transactions will only occur when a positive price differential exists.

Utilizing his past experience and connections in the financial services industry, Dr. Tew has established a team of three people led by Pete Echanique to serve as a market-making and trading team between American Depository Receipts (ADRs) at the US stock exchanges and ordinary shares (ORDs) traded on the European equity exchanges. The traders have arranged with a prime brokerage to use up to 5 million euros of the brokerage's capital to engage in ADR arbitrage in exchange for a portion (25%) of the revenues generated. The brokerage is willing to permit the use of its capital by the trading team because of the low risk of the transactions, the percentage of revenue paid in exchange for use of the capital, and the desire to increase available capital. The balance of the revenues generated will flow through Golden Isles Technology to Golden Isles Industrial, the pension group trust holding the Tew family IRAs, subject to payment of the traders upon proper invoicing. The trading revenue is generated by use of the brokerage's capital, not the funds in the Debtors' IRAs. Thus, the essential elements needed to implement the Arbitrage Process have been assembled by Dr. Tew with no out-of-pocket expenses. Nor are the Debtors parties to any written contracts with the trading team or the brokerage.

The diagram attached as **Exhibit I** illustrates the nature of ADR/ORD arbitrage. Basically, the volume of ORDs vs ADRs must be equivalent after currency equilibrating. If one is larger than

the other, the trading team cancels ADRs and receives ORDs for a fee of 5 cents each. If the volumes in the previous example are reversed, the team creates ADRs and sells ORDs again for a fee of 5 cents. The creation and cancellation of ADRs must be cleared by an approved depository bank. There are three depository banks in the United States that do this: JPMorgan Chase, CitiBank, and Bank of New York. These U.S. clearing banks have a daily quota of unsponsored ADRs and per U.S. securities regulations must create or cancel all sponsored ADRs presented to the ADR depository. Two of the trading team members previously ran the ADR desks at JPMorgan Chase and CitiBank. The trading team has arranged with a prime brokerage and depository bank to begin executing the Arbitrage Process. Dr. Tew has not communicated with any of the banks/brokers due to the pending SKAT allegations.

The specific requirements for this strategy are:

1. The trades must be executed in a prime brokerage account, preferably a retirement account. The account must be able to execute multi-currency/multi-market trades. The account can utilize leverage but it is not necessary.
2. There must be a trader in London to execute European ORD trades and a trader in the US to execute the ADR half of the trade.
3. The other team members coordinate and identify the daily cancellation and creation of ADRs, as there is only a two-hour window within which the trades can be executed.
4. There must be pairs trading software created and electronic connections established into eleven different stock exchanges with currency corrections. After the general software is tested each country connection must be tested.

The proceeds from weekly trades are paid in cash by the depository banks and paid each Monday. To date, the following steps have been completed to effect the Arbitrage Process:

The traders have established a prime brokerage/multi-currency account;

Appropriate dynamic software has been created and modified and tested in each of eleven trading exchanges;

Test trades have been completed successfully and profits of $2,500.00 have been returned to Golden Isles Technology as payment on the trading swap;

All traders have been paid for the test trades after invoicing Golden Isles; and

Basket trading ability is currently being tested after which a complete month of revenue can be completed with the expectation of $70,000 to $200,000 net monthly profits being realized by Golden Isles Industrial, of which 80% would be deposited to Dr. Tews' Roth IRA and 4% would be deposited to Mrs. Tews' Roth IRA.

A team of experienced equity traders and software engineers has been secured. High-speed trading software has been created and implemented. The high-speed trading software has been allowed and connected through encrypted portals to local stock markets in Germany, France, Spain, Italy, Belgium, Netherlands, Great Britain, South Africa, Australia, Singapore, Mexico,

Japan, Brazil, and of course the United States. Arbitrage software has been tested in all markets with purchases and sales being ordered/completed in less than 1 second. Fees are generated via the strategy by creation/cancellation of unsponsored and sponsored ADRs. Three examples of daily potential income are reflected on the test trade results attached as **Exhibit J**. All the trades illustrated on each spreadsheet have actually been transacted at each exchange. The trades were then cancelled because the current clearing bank of the prime broker did not have the staff to facilitate this daily activity. In addition, the trading team engaged in limited trading activity in February, generating net income of $2,500 for Golden Isles Technology, as reflected by the bank statement attached as **Exhibit K**. Revenue will transfer from Golden Isles Technology to Golden Isles Industrial pursuant to the terms of the Swap Agreement.

      5.6.3   **Continued Engagement of Professionals**.  The Reorganized Debtors shall continue the engagement of DelCotto Law Group PLLC, Golden Law and such other professionals as may be necessary for the purposes of rendering services in connection with implementing the Plan, resolving Claims, and performing routine post-Confirmation Chapter 11 administration, such as final reporting and moving to have the Case closed upon Plan completion.

## ARTICLE VI

## RISK FACTORS

    6.1   **Risks of Non-Confirmation.**

      If no Plan can be confirmed, the Chapter 11 Bankruptcy Case may be converted to a case under Chapter 7 of the Bankruptcy Code, in which case a trustee would be elected or appointed to liquidate the Debtors' Assets for distribution to Creditors in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that Confirmation is preferable to Chapter 7 liquidation because the Plan maximizes the distributions to all Classes of Creditors, and any alternative to Confirmation would result in substantial delays and potentially lesser recoveries as persons unfamiliar with the Debtors' Assets would assume administration of the Case.  It is projected that only the secured creditors would have any recovery in any type of liquidation, and even this recovery could be substantially less, since an "auction" sale could produce lower results than any going concern, ordinary-course sale. A Chapter 7 would also end any obligation of Mr. Tew to contribute Disposable Income, to the detriment of all Creditors.

    6.2   **Risks of Non-Consensual Confirmation.**  Pursuant to the "cramdown" provisions of 11 U.S.C. § 1129, the Bankruptcy Court can confirm the Plan at the Debtors' request if at least one impaired Class has accepted the Plan (with such acceptance being determined without including the acceptance of any "insider" in such Class) and, with respect to each Impaired class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to impaired Classes.  In accordance with 11 U.S.C. §§ 1129(a)(8) and (b), the Debtors will request Confirmation of the Plan without the acceptance of all impaired Classes entitled to vote.

      The Debtors reserve the right to modify the terms of the Plan as necessary for Confirmation without the acceptance of all impaired Claims.  Such modification could result in

less favorable treatment for any non-accepting Classes than the treatment currently provided for in the Plan.  Such less favorable treatment could include a distribution of property of a lesser value than that currently provided for in the Plan or no distribution of property whatsoever.

6.3    **Risks of Delays in Confirmation.**    Any delay in Confirmation and effectiveness of the Plan could result in, among other things, increased Administrative Claims or contested fights with secured creditors.  These or any other negative effects of delays in Confirmation of the Plan could endanger the ultimate approval of the Plan by the Bankruptcy Court.

## ARTICLE VII

## PLAN CONFIRMATION

7.1    **Generally.**    To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Debtors, including that the:

(1)    Plan has classified Claims and Interests in a permissible manner;

(2)    Plan complies with the applicable provisions of the Bankruptcy Code;

(3)    Debtors comply with the applicable provisions of the Bankruptcy Code;

(4)    Debtors, as proponent of the Plan, have proposed the Plan in good faith and not by any means forbidden by law;

(5)    Disclosure required by 11 U.S.C. § 1125 has been made;

(6)    Plan has been accepted by the requisite votes of creditors and equity interest holders (except to the extent that cramdown is available under 11 U.S.C. § 1129(b));

(7)    Plan is feasible;

(8)    Plan is in the "best interests" of all holders of Claims or Interests in an impaired Class by providing to creditors or interest holders, on account of such Claims or Interests, property of value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a Chapter 7 liquidation unless each holder of a Claim or Interest in such Class has accepted the Plan;

(9)    Fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date;

(10)    Plan provides for the continuation after the Effective Date of all retiree benefits, as defined in 11 U.S.C. § 1114, at the level established at any time prior to Confirmation pursuant to 11 U.S.C. §§ 1114(e)(1)(B) or 1114(g), for the duration of the period that the Debtors have obligated themselves to provide such benefits; and

(11)    Disclosures required under 11 U.S.C. § 1129(a)(5) concerning the identity and affiliations of persons who will serve as officers, directors, and voting trustees of the successors to the Debtors have been made.

7.2    **Voting Requirements for Confirmation under the Bankruptcy Code.**

7.2.1    **General Voting Information.**

PLEASE CAREFULLY FOLLOW ALL OF THE INSTRUCTIONS CONTAINED ON THE BALLOT PROVIDED TO YOU.  ALL BALLOTS **MUST** BE COMPLETED AND RETURNED IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED.

TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE DEADLINE SET BY THE COURT AND AT THE ADDRESS SET FORTH ON YOUR BALLOT. IT IS OF THE UTMOST IMPORTANCE TO THE DEBTORS THAT YOU VOTE PROMPTLY TO ACCEPT THE PLAN.  IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT THE DEBTORS OR ITS COUNSEL.

IF YOU HOLD CLAIMS IN MORE THAN ONE CLASS, IF YOU HOLD MULTIPLE GENERAL UNSECURED CLAIMS, OR UNDER CERTAIN OTHER CIRCUMSTANCES, YOU MAY RECEIVE MORE THAN ONE BALLOT. YOU SHOULD COMPLETE, SIGN, AND RETURN EACH BALLOT YOU RECEIVE.

**ACCEPTANCE OR REJECTION OF THE PLAN WILL BE DETERMINED, PURSUANT TO THE BANKRUPTCY CODE, BASED UPON THE BALLOTS OF THE CREDITORS HOLDING ALLOWED CLAIMS THAT *ACTUALLY VOTE* ON THE PLAN.  THEREFORE, IT IS IMPORTANT THAT CLAIMANTS EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN.**

IF ANY OF THE CLASSES OF HOLDERS OF IMPAIRED CLAIMS VOTE TO REJECT THE PLAN: (A) THE DEBTORS MAY SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS OF 11 U.S.C. § 1129(b) AND, IF REQUIRED, MAY AMEND THE PLAN TO CONFORM TO THE STANDARDS OF SUCH SECTION; OR (B) THE PLAN MAY BE MODIFIED OR WITHDRAWN WITH RESPECT TO A PARTICULAR CREDITOR, OR (C) THE PLAN MAY BE WITHDRAWN IN ITS ENTIRETY.

### 7.2.2    **Classes Entitled to Vote on the Plan.**

(a) **Generally.**  Pursuant to the Bankruptcy Code, only classes of claims against or equity interests in a debtor that are "impaired" under the terms of a plan of liquidation or reorganization are entitled to vote to accept or reject a plan.  A class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or interests of that class are modified, other than by curing defaults and reinstating maturity.  Classes of Claims and Interests that are not impaired are *not* entitled to vote on the Plan and are conclusively presumed to have accepted the Plan.  In addition, Classes of Claims and Interests that receive no distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan unless such Class otherwise indicates acceptance.  *The classification of Claims and Interests under the Plan is summarized, together with an indication of whether each Class of Claims or Interests is impaired, in Section 5.5.*

(b) **Contested and Unliquidated Claims.** Contested, disputed, contingent, and/or unliquidated Claims are _not_ entitled to vote to accept or reject the Plan.  If your Claim has been estimated for voting purposes by Court Order, you will be allowed to vote your Claim in the amount estimated by said Order.  If ballots are erroneously sent to a Creditor not entitled to vote, then the ballot will not be counted in the calculation of the Creditors voting to accept or reject the Plan.  If you are a Creditor holding a contested or disputed claim, you may ask the Court to have your Claim temporarily allowed for the purpose of voting pursuant to Fed. R. Bankr. P. 3018.

### 7.2.3    **Voting Procedures and Requirements.**

(a)    **Ballots and Voting.**  Creditors holding Allowed Claims entitled to vote on the Plan will be sent a ballot and instructions for voting along with this Disclosure Statement.  Creditors should read the ballot carefully and follow the instructions.  In voting to accept or reject the Plan, you must use *only* the ballot sent to you with this Disclosure Statement.  Creditors entitled to vote must complete, sign, and return their ballots to counsel for the Debtors on or before the Voting Deadline.  Fed. R. Bankr. P. 3018(a) permits a Creditor, for cause, to petition the Court to permit it to change or withdraw its vote on a plan.  Any such petition must be made before the Confirmation Hearing, unless otherwise permitted by the Court.  The Debtors will present the results of the voting to the Bankruptcy Court prior to the Confirmation Hearing.

(i)    **Lost or Damaged Ballots.**  If you are entitled to vote and you did not receive a ballot, received a damaged ballot, or lost your ballot, please contact Tresine Callahan at DelCotto Law Group PLLC at (859) 231-5800 or tcallahan@dlgfirm.com.  Also, this Disclosure Statement, the Plan, and all of the related Exhibits and Schedules are available upon request to any party in interest by contacting the Debtors' counsel.

(ii)    **Effective Transmittal of Ballots.**  Votes cannot be transmitted orally.  Accordingly, you are urged to return your signed and completed ballot by hand delivery, overnight service, facsimile, email, or regular U.S. mail, promptly.

(b)     **Requirements for Class Acceptance.**  As a condition of Confirmation, the Bankruptcy Code requires that each class of Claims that is impaired vote to accept the Plan, subject to the exception of 11 U.S.C. § 1129(b), which still requires one class of Claims that is impaired to have voted to accept the Plan.  A class of Claims accepts the Plan if: (i) holders of at least two-thirds in the total dollar amount of Allowed Claims in that class, and (ii) a majority in number of holders of Claims in that class, vote to accept the Plan.

### 7.3     General Requirements for Confirmation under the Bankruptcy Code.

7.3.1     **Best Interests of Creditors/Liquidation Analysis.**   Notwithstanding acceptance of the Plan by each impaired Class, to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each holder of a Claim or Interest in any such impaired Class who has not voted to accept the Plan.  Accordingly, if an impaired Class does not unanimously accept the Plan, the "best interests" test requires that the Bankruptcy Court find that the Plan provides to each member of such impaired Class a recovery on account of the member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that each such member would receive if the Debtors' Assets were liquidated under Chapter 7 of the Bankruptcy Code on such date.

To estimate what members of each impaired Class of Claims or Interests would receive if the Debtors' Assets were liquidated under Chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if the Chapter 11 Bankruptcy Case was converted to a Chapter 7 case under the Bankruptcy Code and the Debtor's Assets were liquidated by a Chapter 7 trustee (the "Liquidation Value").  The Liquidation Value would consist of the net proceeds from the disposition of the assets of the Debtors, augmented by any unencumbered cash held by the Debtors.

The Liquidation Value available to holders of Unsecured Claims and Interests would be reduced by, among other things: (a) the Claims of secured creditors to the extent of the value of their collateral; (b) the costs, fees, and expenses of the liquidation, as well as other administrative expenses of the Debtors' Chapter 7 case; (c) unpaid Administrative Claims of the Chapter 11 Case; and (d) Priority Claims and Priority Tax Claims.  The Debtors' costs of liquidation in Chapter 7 would include the compensation of a trustee, as well as of counsel and of other professionals retained by a trustee, asset disposition expenses, applicable taxes, litigation costs, claims arising from any operations of the Debtors during the pendency of the Chapter 7 case, and all unpaid Administrative Claims incurred by the Debtors during the Chapter 11 case that are allowed in the Chapter 7 case.  The liquidation itself would likely accelerate the payment of certain Priority Claims and Priority Tax Claims that would otherwise be payable in the ordinary course of business.  These Priority Claims and Priority Tax Claims would be paid to the extent possible out of the net liquidation proceeds, after payment of Secured Claims, before the balance would be made available to pay Unsecured Claims or to make any distribution in respect of Interests.  The Debtors believe that the liquidation also would generate an increase in Unsecured Claims, such as rejection damages Claims, and Tax and other governmental Claims.

The information contained in **Exhibit L** attached hereto provides a summary of the Liquidation Values of the Debtors' Assets, assuming a hypothetical Chapter 7 liquidation in which

a trustee appointed by the Bankruptcy Court would liquidate the Debtors' Assets and the Debtors' estimated property values are reasonably accurate.

In summary, the Debtors believe that a Chapter 7 liquidation of the Debtors' Assets might result in full payment of their secured creditors, there would be a risk of deficiency balances and no payment to the unsecured creditors whereas under the proposed distributions under the Plan all creditors will be paid in full or in part, because of, among other factors: (a) the depressed value of the Debtors' Assets in a liquidation sale, (b) the negative impact of conversion to a Chapter 7 case and additional costs and expenses involved in the appointment of a Chapter 7 trustee and attorneys, accountants, and other professionals to assist such trustee in the Chapter 7 case; (c) additional expenses and Claims, some of which would be entitled to priority in payment, that would arise by reason of a liquidation; and (d) the loss of the Debtors' Disposable Income to fund payments to creditors.  Consequently, the Debtors believe that the Plan will provide a greater ultimate return to holders of Claims than a Chapter 7 liquidation.

7.3.2    **Feasibility of Plan.**  Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation of the Debtors or any successor to the Debtors, or the need for further financial reorganization, unless such liquidation or reorganization is proposed in the Plan.  Based on the Debtors' analysis, the Reorganized Debtors will have sufficient assets and income to accomplish their tasks under the Plan.  Therefore, the Debtors believe that its reorganization pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.  To support this contention, the Debtors' financial projections for the first three years of the Plan term are attached hereto as **Exhibit D**. These financial projections were prepared on a cash basis, in general compliance with GAAP principles (although strict adherence to GAAP principles was not done).

7.3.3    **Compliance with Applicable Provisions of the Bankruptcy Code.** Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code.  The Debtors have considered each of these issues in the development of the Plan and believe that the Plan complies with all applicable provisions of the Bankruptcy Code.

7.4    **Confirmation.**

7.4.1    **Confirmation Hearing.**  The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on whether the Debtors have fulfilled the Confirmation requirements of 11 U.S.C. § 1129. The Confirmation Hearing has been or will be scheduled by Order of the Court and you will or have received notice of the hearing by separate notice/order. If you have any questions concerning the hearing, please contact the undersigned counsel.

7.4.2    **Objections to Confirmation.**  Any objection to Confirmation must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection, and the amount of the Claim or Interest held by the objector.  Any such objections must be filed and served upon the persons designated in the notice of the Confirmation Hearing and in the manner and by the deadline described therein.

### 7.4.3 **Methods of Confirmation.**

(a) **Confirmation Based on Plan Acceptance.**  A plan is accepted by an impaired class of claims if holders of at least two-thirds in dollar amount and a majority in number of claims of that class vote to accept the plan.  Only those holders of claims who actually vote (and are entitled to vote) to accept or to reject a plan count in this tabulation.  In addition to this voting requirement, 11 U.S.C. § 1129 requires that a plan be accepted by each holder of a claim or interest in an impaired class or that the plan otherwise be found to be in the best interests of each holder of a claim or interest in an impaired class by the Bankruptcy Court.

(b) **Confirmation through Cramdown.**  The Bankruptcy Code contains provisions for confirmation of a plan even if it is not accepted by all impaired classes, so long as at least one impaired class of claims has accepted it.  These "cramdown" provisions are set forth in 11 U.S.C. § 1129(b).  As indicated above, the Plan may be confirmed under the cramdown provisions if, in addition to satisfying the other requirements of 11 U.S.C. § 1129(a), it: (a) is "fair and equitable;" and (b) "does not discriminate unfairly" with respect to each non-accepting Class of Claims or Interests that is impaired under the Plan.  The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting class of unsecured claims or a class of interests receives full compensation for its allowed claims or allowed interests, no holder of allowed claims or interests with respect to such debtor in any junior class may receive or retain any property on account of such claims or interests.  With respect to a dissenting class of secured claims, the "fair and equitable" standard requires, among other things, that holders either: (a) retain their liens and receive deferred cash payments with a value as of the effective date equal to the value of their interest in property of the debtor's estate; or (b) receive the indubitable equivalent of their secured claims.  The "fair and equitable" standard has also been interpreted to prohibit any class senior to a dissenting class from receiving under a plan more than 100% of its allowed claims or allowed interests.  The Debtors believe that, if necessary, the Plan may be crammed down over the dissent of certain Classes of Claims, in view of the treatment proposed for such Classes.

The requirement that the Plan not "discriminate unfairly" means, among other things, that a dissenting class must be treated substantially equally with respect to other classes of equal rank.  The Debtors do not believe that the Plan unfairly discriminates against any Class that may not accept or otherwise consent to the Plan.  Subject to the conditions set forth in the Plan, a determination by the Bankruptcy Court that the Plan, as it applies to the Debtors, is not confirmable pursuant to 11 U.S.C. § 1129 will not limit or affect: (a) the confirmability of the Plan as it applies to the Debtors; or (b) the Debtors' ability to modify the Plan, as it applies to the Debtors, to satisfy the provisions of 11 U.S.C. § 1129(b).

### 7.5 **Alternatives to Confirmation.**  If the Plan is not confirmed and consummated, the alternatives include preparation and presentation of an alternative plan of reorganization or a conversion of this case to one under Chapter 7 of the Bankruptcy Code.  If the Court denies confirmation, the Debtors or any other party in interest could propose a different Plan.  The Debtors believe such an alternative plan would result in less return to creditors than the distributions to creditors pursuant to the Plan.  Before proposing the present Plan, the Debtors explored other alternatives and engaged in negotiations with its major Secured Creditors.  The Debtors believe

not only that the Plan fairly adjusts the rights of various classes of Creditors and enables Creditors to realize the most possible under the circumstances, but also that rejection of the Plan in favor of some alternative arrangement will require, at the very least, an extensive and time-consuming process and will not result in a better recovery for any Class.

## ARTICLE VIII

### CERTAIN FEDERAL TAX CONSEQUENCES

> IRS Circular 230 Disclosure: To ensure compliance with requirement imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.

8.1 **General**.

A DESCRIPTION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS PROVIDED BELOW. THE DESCRIPTION IS BASED ON THE INTERNAL REVENUE CODE, TREASURY REGULATIONS, JUDICIAL DECISIONS, AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT. CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION MAY HAVE RETROACTIVE EFFECT, WHICH MAY CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW. NO RULING HAS BEEN REQUESTED FROM THE IRS, NO LEGAL OPINION HAS BEEN REQUESTED FROM COUNSEL CONCERNING ANY TAX CONSEQUENCE OF THE PLAN, AND NO TAX OPINION IS GIVEN BY THIS DISCLOSURE STATEMENT.

THIS DESCRIPTION DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTORS OR HOLDERS OF CLAIMS. FOR EXAMPLE, THE DESCRIPTION DOES NOT ADDRESS ISSUES OF SPECIAL CONCERN TO CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, TAX-EXEMPT ORGANIZATIONS, AND FOREIGN TAXPAYERS, NOR DOES IT ADDRESS TAX CONSEQUENCES TO HOLDERS OF INTERESTS IN THE DEBTORS. THIS DESCRIPTION DOES NOT DISCUSS THE POSSIBLE STATE TAX OR NON-U.S. TAX CONSEQUENCES THAT MIGHT APPLY TO THE DEBTORS OR TO HOLDERS OF CLAIMS.

FOR THESE REASONS, THE DESCRIPTION THAT FOLLOWS IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM. HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN.

8.2    **Tax Consequences of Payment of Allowed Claims Pursuant to Plan Generally.**
The federal income tax consequences of the implementation of the Plan to the holders of Allowed
Claims will depend, among other things, on the consideration to be received by the holder, whether
the holder reports income on the accrual or cash method, whether the holder receives distributions
under the Plan in more than one taxable year, whether the holder's Claim is Allowed or disputed
on the Effective Date, and whether the holder has taken a bad debt deduction or worthless security
deduction with respect to its claim.

8.2.1    **Recognition of Gain or Loss.**  In general, a holder of an Allowed Claim
should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim,
less the holder's tax basis in the Claim.  Any gain or loss recognized in the exchange may be long-
term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of
the Allowed Claim and the holder, the length of time the holder held the Claim, and whether the
Claim was acquired at a market discount.  If the holder realizes a capital loss, the holder's
deduction of the loss may be subject to limitation.  The holder's tax basis for any property received
under the Plan generally will equal the amount realized.  The holder's amount realized generally
will equal the sum of the cash and the fair market value of any other property received by the
holder under the Plan on the Effective Date or a subsequent distribution date, less the amount (if
any) treated as interest, as discussed below.

8.2.2    **Post-Effective Date Distributions.**  Because certain holders of Allowed
Claims, including Disputed Claims that ultimately become Allowed Claims, may receive cash
distributions after the Effective Date, the imputed interest provisions of the Internal Revenue Code
may apply and cause a portion of the subsequent distribution to be treated as interest.  Additionally,
because holders may receive distributions with respect to an Allowed Claim in a taxable year or
years following the year of the initial distribution, any loss and a portion of any gain realized by
the holder may be deferred.  All holders of Allowed Claims are urged to consult their tax advisors
regarding the possible application of (or ability to elect out of) the "installment method" of
reporting with respect to their Claims.

8.2.3    **Receipt of Interest.**  Holders of Allowed Claims will recognize ordinary
income to the extent that they receive cash or property that is allocable to accrued but unpaid
interest which the holder has not yet included in its income.  If an Allowed Claim includes interest,
and if the holder receives less than the amount of the Allowed Claim pursuant to the Plan, the
holder must allocate the Plan consideration between principal and interest.  The holder may take
the position that the amounts received pursuant to the Plan are allocable first to principal, up to the
full amount of principal, and only then to interest.  However, the proper allocation of Plan
consideration between principal and interest is unclear, and holders of Allowed Claims should
consult their own tax advisors in this regard.  If the Plan consideration allocable to interest with
respect to an Allowed Claim is less than the amount that the holder has previously included as
interest income, the previously included but unpaid interest may be deducted, generally as a loss.

8.2.4    **Bad Debt or Worthless Securities Deduction.**  A holder who receives, in
respect of an Allowed Claim, an amount less than the holder's tax basis in the Claim may be
entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount
under 26 U.S.C. § 166(a) or a worthless securities deduction under 26 U.S.C. § 165(g).  The rules

governing the character, timing, and amount of bad debt and worthless securities deductions place considerable emphasis on the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed.  Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

      8.2.5   **Information Reporting and Withholding.**   Under the Internal Revenue Code's backup withholding rules, the holder of an Allowed Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan, unless the holder comes within certain exempt categories (which generally include corporations) and, when required, either demonstrates that categorization or provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.  Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax.  Holders of Allowed Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

      8.3   **Certain U.S. Federal Income Tax Consequences to the Debtors.**   In the event that the Debtors sell any of their Assets, the Debtors will generally recognize a gain or loss on the sale of those Assets, equal to the difference between the amount realized on the sale and the adjusted tax basis of the Assets being sold.  Additionally, if the Debtors convey appreciated (or depreciated) property (i.e. property having an adjusted tax basis less (or greater) than its fair market value) to a creditor in cancellation of full recourse debt, the Debtors must recognize taxable gain or loss equal to the excess or shortfall, respectively, of such fair market value over that adjusted basis.  This gain or loss may be ordinary income or loss, capital gain or loss, or a combination of each, and may be offset against any applicable net operating loss carry-forwards from previous tax years.

      Further, the discharge of a recourse debt obligation by the Debtors in exchange for the Debtors' payment of cash and/or transfer of property with a fair market value that is less than the adjusted issue price of the debt obligation (as determined for U.S. federal income tax purposes) may give rise to cancellation of indebtedness ("COD") income.  COD income must generally be included in the Debtor's gross income, subject to certain statutory or judicial exceptions that may limit the amount of COD income required to be included.  One such statutory exception applies to certain debtor whose discharge of indebtedness is granted in a case brought under Title 11 of the United States Code (relating to bankruptcy), pursuant to a court-approved plan of reorganization.

      For the foregoing reasons, the precise amount of taxable gain or loss, COD income, or both that the Debtors may realize as a result of effectuation of the Plan cannot be determined until the date of the exchange.

# <u>ARTICLE IV</u>

## ADDITIONAL INFORMATION, RECOMMENDATIONS, AND CONCLUSION

9.1    **<u>Additional Information.</u>**  Any statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete, and in each instance, reference is made to such document for the full text thereof.  Certain documents described or referred to in this Disclosure Statement have not been attached as exhibits because of the impracticability of furnishing copies of these documents to all recipients of this Disclosure Statement.  The Debtors will file all exhibits to the Plan with the Bankruptcy Court, and the exhibits also will be available upon request from the Debtors' counsel.

9.2    **<u>Recommendations and Conclusion.</u>**  The materials provided in this Disclosure Statement are intended to assist you in reviewing the Plan in an informed manner.  If the Plan is confirmed, you will be bound by the terms of the Plan.  You are urged to study these materials and make such further inquiries as you may deem appropriate.

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that the Confirmation and consummation of the Plan is preferable to all other alternatives.  Consequently, the Debtors urge all holders of Claims in voting Classes to vote to accept the Plan and to evidence their acceptance by duly completing and returning their ballots so that they will be received on or before the Voting Deadline.

*[Remainder of page intentionally blank. Signature page follows.]*

Dated:  March 31, 2021

Respectfully submitted,


By:    /s/ Bernard V. Tew
       BERNARD V. TEW


By:    /s/ Andrea B. Tew
       ANDREA B. TEW


TENDERED BY:

DELCOTTO LAW GROUP PLLC

/s/ Dean A. Langdon, Esq.
200 North Upper Street
Lexington, KY 40507
Tel: (859) 231-5800
Fax: (859) 281-1179
E-mail:  dlangdon@dlgfirm.com
COUNSEL FOR DEBTORS

/Pleadings/Plan/Disclosure Statement 2d Amd 20210331.docx