UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

IN RE:

BERNARD and ANDREA TEW, et al.                          CASE NO. 20-51078
                                                              CHAPTER 11

        DEBTORS IN POSSESSION

---

**DECLARATION OF BERNARD V. TEW IN SUPPORT OF
CONFIRMATION OF PLAN OF REORGANIZATION**

---

Pursuant to 28 U.S.C. § 1746, I, Bernard V. Tew, declare as follows:

1.      I am one of the Debtors in this case, over the age of 18, and have personal knowledge of the facts set forth in this Declaration. If called to testify, I would affirm all statements in this Declaration.

2.      This Declaration is filed in support of confirmation of the Debtors' Amended Chapter 11 Plan of Reorganization [ECF No. 184] and is being provided in addition to the Second Amended Disclosure Statement for Debtors' Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code [ECF No. 185] and the Declaration in support thereof (the "First Declaration") [ECF No. 183-1], all of which are incorporated herein by reference.

3.      I am married to Andrea B. Tew, and we reside in Woodford County, Kentucky. I am the majority limited partner of Tew LP, a Kentucky limited partnership which was formed on November 2, 2000. The general partner is SV Holdings, LLC, a Kentucky limited liability company managed by my adult daughter, Stephanie Campbell. The other limited partners of Tew LP are individuals or entities connected to my family. Tew LP owns and operates a 60-acre farm in Woodford County, Kentucky, and also owns several thoroughbred horses. Certain horses were in the possession of a third-party trainer when the case was filed but have been returned to the

possession of Tew LP. The Tew LP farm is subject to mortgages in favor of Traditional Bank and Central Bank and is adjacent to a 30-acre parcel and home where I live. Limited partners other than my wife and I have contributed funds and/or services during our bankruptcy case to properly care for the thoroughbred horses and the farm property.

4.      I currently receive $2,285 per month in social security benefits. After initially retiring from the investment advisor industry, I was approached by George Hofmeister about managing ERISA benefit plans for various corporate entities he owned. I agreed to do so and formed Bluegrass Investment Management, LLC for that purpose. Mr. Hofmeister was ultimately convicted of criminal conduct in connection with his actions in regard to the ERISA-covered retirement plans of his corporate entities.  I was not charged criminally but was a defendant in a civil enforcement action related to the Hofmeister retirement plans. Pursuant to a Consent Judgment (the "Consent Judgment") entered by the United States District Court for the Eastern District of Kentucky on July 8, 2015 Bluegrass Investment Management and I agreed to refrain from serving as a fiduciary or service provider to any ERISA-covered employee benefit plan, except for plans where I and my relatives were the participants. I was not, and am not, prohibited by the Consent Judgment from advising non-ERISA benefits plans for third parties, including individual retirement accounts ("IRAs").

5.      After entry of the Consent Judgment and through early 2018, my wife and I were able to generate adequate income to service our debts by managing IRAs for family and friends through pension group trusts.  These pension group trusts, and their profitability are reflected on Schedule G of our Second Amended Disclosure Statement [ECF 185-7]. Profits were largely derived by engaging in the purchase of foreign dividend rights, and subsequently submitting requests for refunds of foreign taxes withheld, as authorized by certain treaties between the

United States and foreign countries. In Europe and other foreign countries, shareholders may sell dividend rights without selling the underlying security. A shareowner who would otherwise be subject to a tax on the dividend may sell the dividend rights to a tax-exempt entity at a discount, entitling the tax-exempt entity to obtain profits from the difference between the discounted price and actual dividend issued (after refund of foreign taxes withheld). These profits are identified as "withholding receivables" on Schedule G of the Disclosure Statement. As described in more detail below, this ability to generate revenue through the purchase of dividends and refund of taxes came to an end in 2018 after SKAT filed civil cases in Europe questioning the practice and other countries in Europe began similar legal actions.

6.      In June of 2018, I was named as a defendant in numerous lawsuits which are now part of federal multidistrict litigation styled In re Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) Tax Refund Scheme Litigation, Case No. 18-md-2865 (the "SKAT Litigation") currently pending in the United States District Court for the Southern District of New York.[1] The SKAT Litigation included allegations of fraud in connection with the submission of refund requests for taxes withheld on foreign stock dividends. These cases mirrored the civil cases filed in Europe. I retained the law firm of Seward & Kissel LLP to defend me and my family members in the SKAT Litigation and expended substantial sums and incurred substantial debts to defend the SKAT Litigation.

7.      The allegations of fraud in the SKAT Litigation resulted in my being unable to maintain direct trading ability in stock markets or employment of any type in my industry. For example, I attempted to tutor economic and math students online and was prohibited from doing so after discussions with eFinancialCareers (an employment clearinghouse). Furthermore, because my wife was an online trader for most of her 30 years in financial services (at times

---

[1] Mrs. Tew and all other adult Tew family members were named as a defendant in these federal lawsuits.

being responsible for 2-5% of the daily NYSE volume using my trading models), she could not obtain employment once the SKAT Litigation began. Finally, the allegations in the SKAT Litigation caused other European countries to suspend the refund of taxes on dividends paid to tax-exempt entities pending further investigation. These events resulted in the loss of my ability to generate revenue from family retirement accounts.

7.      When the SKAT Litigation began, the Tew family retirement accounts were beneficiaries of various pension group trusts held by ED&F Man Capital Markets ("ED&F") as custodian. As a consequence of the foreign SKAT Litigation, ED&F caused a portion of the assets of the pension group trust (and thus, the family retirement accounts) to be used to pay legal fees and costs to counsel in Denmark to defend the foreign SKAT Litigation. Subsequently, the balances of the family retirement accounts were rolled over into Roth IRA accounts and became beneficiaries under the Bluegrass Retirement Group Trust and MSJJ pension group trust. Both of these accounts were also held by ED&F in London England. While the value of the Tew family retirement plans as one time exceeded $14 million, the ED&F would not disburse the assets. ED&F was subsequently named as one of the co-conspirators in pension fraud litigation in Europe. An example of the allegations regarding ED&F is contained in the April 15, 2020 letter from their counsel (Rosenblatt) demanding reimbursement from Castings Pension Group Trust, attached as Exhibit A. In summary, the entire Tew family's retirement savings were taken and the careers of my wife and I were severely damaged.

8.      In connection with our bankruptcy case, my wife and I (through counsel) engaged in negotiations with SKAT in an effort to resolve its claims and determine the treatment of its claims in our bankruptcy case.  Those painstaking, long negotiations resulted in a settlement

agreement which was presented to and approved by this Court [ECF Nos. 217, 232][2], which will result in the dismissal of the claims against my children, my wife and me after confirmation of our Chapter 11 Plan. The resolution of the SKAT Litigation as it relates to me personally has made it easier for me to be directly involved in the ADR arbitrage process, as described below.

9.      Shortly after the SKAT Litigation began, I contacted my insurance carriers to provide a defense to the claims asserted against my family and a family limited partnership, Tew LP. The insurance carriers declined to provide a defense and in 2020 Drew Meadows and the Golden Law Office were retained to bring claims against the insurance carriers. The claims are currently pending in the cases of *Bernard Tew, Andrea Tew, Vincent Tew and Stephanie Tew v. Kentucky Farm Bureau Mutual Insurance Company and Acuity, a Mutual Insurance Company*, Woodford Circuit Court Case No. 20-CI-00066 and *Travelers Indemnity Company of America v. Bernard Tew, Andrea Tew, Vincent Tew, Stephanie Tew and Tew LP*, U.S. District Court for the Eastern District of Kentucky Case No. 5:20-cv-00292-JMH.

10.     This Court approved the ongoing retention of Golden Law Office after our case was filed [ECF No. 81].   In early to mid-August, Golden Law Office filed motions for declaratory judgment in each pending lawsuit, seeking a determination that the carriers had a duty to pay for the defense of the SKAT Litigation. Briefing schedules are being established in both cases.

11.     The ADR arbitrage process described in the First Declaration is complex and requires substantial skill, time and effort to establish and operate. Exhibit I to the Disclosure Statement (the "Trading Diagram") [ECF 185-9] identifies the transactions which constitute the ADR arbitrage process. A copy of the Trading Diagram is also attached as <u>Exhibit B</u>. Argon Financial ("Argon") is the prime broker for this strategy but does not execute or clear the actual

---

[2] The pleadings and attached documents are also incorporated herein by reference.

trades. Argon provides the use of its capital to back the trades, although the trades are made on a "free of payment" ("FOP") basis, meaning that the cost of the ADR and ORD shares are paid by the ultimate seller or purchaser. Argon must direct all trades approved by PGT Y to an execution broker. Mariana Investments ("Mariana") is an execution broker located in London, England that has been hired by Argon to execute the trades for the ADR arbitrage strategy. Although Mariana is able to execute the ADR/ORD trades, it requires a third broker to clear the trades. That broker is ADM Investor Services International Limited ("ADM"), also located in London, England. Once trades are issued, executed, cleared and settled, payments for issuance and discounts are delivered to Argon. Separate accounts must be established at each institution involved in the ADR arbitrage strategy to properly document the transactions.

12.    In March of 2021, Argon was not able to execute transactions 1,4 and 5 on the Trading Diagram. Contracts between Argon and Mariana are now in place and after receiving trading directions from Argon, Mariana can complete transactions 1,4, and 5 on the Trading Diagram. Steps 2 and 3 on the Trading Diagram only involve completed cancelation and/or origination ADR forms. This step must be completed by an individual authorized by Argon to represent the PGT Y, which is the Golden Isles Technology Pension Group Trust.

13.    Early in 2021 several test trades were completed in the ADR arbitrage strategy. However, these trades did not explicitly show the profitability of the strategy because revenues were deposited into a general prime broker account at Argon. In light of the need for transparency in our bankruptcy case, the initial prime brokerage account between Argon & ADM was closed and a new, completely segregated account (dedicated only to ADR arbitrage) was opened at ADM for Argon. This account is limited to use by me, my wife and son through PGT Y, using Argon funds designated solely for the ADR arbitrage strategy. The compliance process

to open this segregated account has been lengthy and complex. As of September 22, 2021 the final account numbers for Mariana and ADM have been approved and only approval by Argon is required. This approval is expected by September 27, 2021. Currently, an enlisted trader, Simon Wooding, my wife and my son have been approved to trade through the segregated Argon account. Following approval, the flow of a trade will be: identification of an arbitrage opportunity by me using my proprietary knowledge; Bloomberg messaging of that opportunity to trading desk at Mariana for execution; following trade confirmation completed ADR/ORD forms sent to ADM to send on to ADR depository bank, JPMorgan Chase. This entire process should take no more than 30 seconds.

14.    Due to the SKAT Litigation, I could not communicate directly with Argon, Mariana or ADM to facilitate the ADR arbitrage strategy, except through the traders I enlisted. Instead of being able to engage in ADR arbitrage trading myself, I have been required to instruct others on what needs to be done and how to do it. It cannot be underestimated how difficult this has been. Since my First Declaration, some of the traders who were to implement the ADR arbitrage strategy have left, which has delayed implementation of the strategy.  Further delays have resulted from the need for Argon to engage clearing agents and execution brokers with the ability to process the trades that make up the ADR arbitrage strategy, none of whom would deal with me directly due to the allegations in the SKAT Litigation. The impact of the COVID-19 pandemic on the ability to conduct business in Europe has also slowed progress on establishing the ADR arbitrage strategy, and financial services companies in Europe returned to offices only in September of 2021.

15.    The following resources which are needed to implement the ADR arbitrage strategy are currently in place:

a)   First Declaration, Exhibit D [ECF 183-1, p. 9] shows that Argon has agreed to allow the use of up to 5 million euros of its funds for intraday trading in exchange for twenty-five (25%) of the profits generated;

b)   First Declaration, Exhibit E [ECF 183-1, p. 10] shows that Argon is permitting the use of its capital in connection with a swap agreement between Argon and PGT Y dated October 23, 2020;

c)   First Declaration, Exhibit A [ECF 183-1, p. 5] shows that Golden Isles Technology PGT ("Golden Isles Tech") will advise PGT Y on ADR arbitrage strategy. Golden Isles Tech has obtained a Bloomberg terminal which I can access directly. I have implanted my proprietary software in the Bloomberg market spreadsheets. The technology available in my home office, while not on the level of a T1 line, is markedly faster than ordinary internet connectivity. Trading signals are currently being sent to the trading desk at Mariana to execute. However, actual trades will occur only once Argon approves the establishment and connections between the segregated accounts, described above. My ability to use and manipulate this software and infrastructure is an important factor in the success of ADR arbitrage strategy due to the removal of temporal latency and will increase the profitability percentage to my Roth IRA from 37.5% to 75% of available profits. A copy of the Bloomberg contract is attached as Exhibit C; and

d)   Final approval of the segregated account connections between Mariana and ADM has been obtained, but final approval of Argon is required before trading will begin. This approval is expected by September 27, 2021. Once trading begins, I estimate it will take 4 to 8 weeks to realize the full results of the ADR arbitrage strategy. When fully implemented, $70,000 to $200,000 in net monthly profits should being realized by Golden Isles Tech, of which 80% would be deposited to my Roth IRA and 4% would be deposited to Mrs. Tews' Roth IRA to make payments under the Plan.

16.   Based on my past experience, connections with others in the financial services industry and the resolution of the SKAT Litigation, I believe the ADR arbitrage strategy will generate profits for the ROTH IRAs of my wife and I, which will be used to pay our creditors. The ADR arbitrage strategy provides the only realistic option for generating adequate revenue to meet our obligations to creditors. The actions of ED&F and others effectively took all of the Tew family's retirement and wealth and severely damaged the careers of my wife and I. Resolution of

the SKAT Litigation has greatly improved my ability to be directly involved in the ADR arbitrage strategy, but the complexity of the process and need for transparency has delayed active trading. Our Plan has default provisions which will protect creditors in the event the ADR arbitrage strategy does not generate revenue as projected, and I do not believe creditors will be harmed by the brief additional time needed to implement the ADR arbitrage strategy.

Under penalty of perjury, I declare that the foregoing statements are true and correct.

/s/ Bernard V. Tew

Bernard V. Tew

Executed on: September 22, 2021

/Pleadings/Confirmation/Declaration BT V4 20210922.docx

Exhibit A

# rosenblatt

9-13 St Andrew Street, London EC4A 3AF
T +44 (0)20 7955 0880 | F +44 (0)20 7955 0888
DX LDE 493
www.rosenblatt-law.co.uk

ATTN: Marcus Grimmer
910 Aiken Road,
Versailles
Kentucky
40383
USA

**BY EMAIL ONLY:**   MGrimmer@arunvill.com

Our Ref:  JN/TS/CHW/EDF/1/71
Your Ref:

15 April 2020

Dear Sirs

**Tax levy received from Belastingdienst, the Dutch Tax and Customs Administration [the "DTA"]**
**Our Client: ED&F Man Capital Markets Limited**

## Introduction

We act for ED&F Man Capital Markets Ltd ("**MCM**"), which, between 2012 and 2018, acted as an execution only broker and custodian on behalf of your client Casting Pensions Group Trust (the "**Pension Plan**").

As you are aware:

1. our client's services were provided pursuant to a suite of agreements each dated 29 February 2012 and which included our client's Standard Terms and Conditions and Custody Agreement;

2. in 2016 and 2017, pursuant to these Standard Terms and Custody Agreement, and on the Pension Plan's express instructions as communicated by you in your capacity as its investment manager and agent, our client acquired and held on the Pension Plan's behalf shares and dividend rights in a number of Dutch entities (together "the Dutch Transactions", details of which we enclose for your convenience at Appendix A);

3. subsequent to effecting the Dutch Transactions, the Pension Plan then sought and recovered withholding tax to the value of EUR 2,025,676.08 from the DTA on the grounds that it beneficially owned the relevant dividends for the purposes of the double tax treaty between the Netherlands and the USA. This withholding tax was recovered on the Pension Plan's behalf by MCM's former sub-custodian, the Bank of New York Mellon ("**BNY**"), and paid to our client who held it for the Pension Plan in its Custody Account.

Authorised and regulated by the Solicitors Regulation Authority.

Rosenblatt is the trading name of Rosenblatt Limited. Company number 09986118 (Registered in England and Wales)
A list of the directors, together with a list of those persons who are designated as partners, is available for inspection at the registered office of Rosenblatt Limited,
9-13 St. Andrew Street, London, EC4A 3AF

2962983

......./2

Please now find enclosed at Appendix B to this letter, copy correspondence with the DTA which includes a Notice of Assessment from the DTA dated 7 February 2020 and issued against BNY. This Notice imposes Supplemental Levies of EUR 2,025,676.08 (the "**Levies**"), being the recovery of the above withholding tax plus interest, the DTA having concluded that the Pension Plan was not the beneficial owner of the shares and rights set out in Appendix A and thus was not entitled to the withholding tax.

As explained further below, it is MCM's position that the Pension Plan was entitled to the withholding tax and that the DTA's decision to raise the Levies was unlawful. Despite this however, BNY elected not to substantively challenge the Levies and the DTA's decision, but instead sought payment of the Levies from MCM in accordance with the terms of an indemnity contained in BNY's sub-custodian agreement with MCM. Pursuant to this indemnity, MCM was obliged to pay the Levies in full to BNY who duly paid them to the DTA.

**Indemnity Demand**

MCM's payment of the Levies constitutes a loss, liability or cost incurred in connection with the shares and rights it acquired on the Pension Plan's behalf and in the due performance of the services which it performed for the Pension Plan. It therefore falls within the Pension Plan's indemnities to MCM as set out in the Custody Agreement and Standard Terms (the "**Indemnities**"), the terms of which are unequivocal:

- Clause 16(a) of MCM's Custody Agreement: the Pension Plan *"agrees on demand to indemnify [MCM] … against each liability, loss and cost which may be suffered or incurred by [MCM] in connection with the Client Property … and … any Tax for which [MCM] is or may be liable or accountable in connection with the Client Property …"*

- Clause 19 of MCM's Terms and Conditions are equally clear: the Pension Plan *"agree(s) to indemnify [MCM] … against any loss, liability, costs and expenses, which [MCM] … incur either directly or indirectly in the due performance of [MCM's] obligations under these Terms and Conditions."*

Pursuant to the above Indemnities, please treat this letter as a formal demand for payment of EUR 2,025,676.08 (i.e. the Levies) to MCM (the "**Indemnified Sum**"). Unless the Pension Plan agrees to the Terms of Deferral as set out below, we require that such payment is made by bank transfer to the following account by 4pm on Monday 27 April 2020:

| | |
|---|---|
| BANK: | HSBC Bank Plc |
| ADDRESS: | 60 Queen Victoria Street  London  EC4N 4TR |
| ACCOUNT NAME: | Rosenblatt Limited General Client Account |
| SORT CODE: | 40 11 60 |
| ACCOUNT NUMBER: | 23014711 |
| SWIFT / BIC ADDRESS: | HBUKGB4B |
| IBAN NUMBER: | GB27 HBUK 4011 6023 0147 11 |

Please note that pursuant to Clauses 22(a), 22(d) and 22(e) of the Custody Agreement, and in the absence of agreement to the Terms of Deferral set out below, should MCM be forced by to take

2962983

......./3

legal action with respect to the Indemnified Sum, MCM will pursue the requisite debt recovery action in the Courts of England and Wales without further notice, with such action subject to English law.

**The Deferral Offer**

**MCM's position in relation to the Levies**

It is in the interests of all of MCM's clients and former clients, and thus in MCM's own commercial interests, that the decisions of national tax authorities be subject to legal appeal where they are deemed to be fundamentally flawed.

Having taken the advice of Dutch Counsel (and without any waiver of privilege), our client believes that the DTA's decision to issue the Levies was flawed, both in fact and as a matter of Dutch tax law; the DTA having apparently failed to understand the trades brokered by MCM on the Pension Plan's instructions in at least the following ways:

1. MCM received written instructions from you, as the Pension Plan's investment manager, to acquire the relevant securities on the Pension Plan's behalf;
2. MCM acted upon these instructions as an execution only broker by purchasing the securities from independent 3rd party inter-dealer brokers in the market;
3. MCM provided you, as the investment manager, with confirmations of such acquisitions;
4. The Pension Plan then acquired the securities from MCM on a principal to principal basis;
5. MCM provided financing to the Pension Plan for such purchases as part of its normal broking services with the securities constituting collateral in accordance with its Standard Terms;
6. MCM holds settlement SWIFTs confirming the settlement of each of these trades;
7. MCM held the securities as trustee on behalf the Pension Plan in its Custody Accounts again in accordance with the Standard Terms and Custody Agreement (the Pension Plan retaining possession, control (voting rights etc) and the right to use the securities and the economic benefit of the securities);
8. All of which supports the Pension Plan's beneficial ownership and entitlement to withhold tax, since the Pension Plan:
   a. held the economic risk in, benefit in and the right to dispose of the securities at all material times.
   b. owned the relevant shares over the record date and therefore had the right to receive dividends; and
   c. received these into its Custody Account where they were held on trust by MCM in accordance with the Standard Terms, Custody Agreement, S.139 of the Financial Services and Markets Act 2000 and CASS rule 7.7.

In the circumstances, MCM would be willing to conduct an appeal of the DTA's decision on behalf of its clients and former clients. However this not currently possible, since, as a matter of Dutch law, MCM lacks the legal standing to do so, it being neither the relevant tax payer (which is the Pension Plan), nor the addressee of the Notice of Assessment (which is BNY who, as explained above, elected to invoke its indemnity with MCM and pay the Levies to the DTA rather than pursue its own substantive challenge).

However, from conversations we have had with BNY, we understand that the DTA has now issued - or will imminently issue - a formal Notice of Assessment against the Pension Plan for the same

……/4

withholding tax, the purpose of which is to afford the Pension Plan an opportunity to formally challenge the Levies, which, if challenged and if such challenge proves successful, would mean that (i) the Levies are not payable; (ii) BNY would be repaid by the DTA; (iii) MCM would in turn be repaid by BNY; and (iv) the sums demanded under the Indemnities by means of this letter would no longer be payable by the Pension Plan.

Self-evidently, if the Pension Plan has been issued with such a Notice it is in its interest to challenge it by serving a formal notice of objection together with substantive grounds in support (the deadline for which we understand is usually six weeks from the date of the Notice). We nevertheless understand that the Pension Plan may lack the requisite documents and information with which to pursue such an appeal (i.e. those documents evidencing the Dutch Transactions and the Plan's ownership of the relevant securities) and with that in mind our client is willing to defer payment of the Indemnified Sum on the condition that the Pension Plan accepts the Terms of Deferral set out below.

**Terms of Deferral**

Upon delivery (by email) to this firm of (i) a signed power of attorney in the form enclosed at Appendix C; and (ii) a copy of a Notice of Assessment issued in the name of the Pension Plan by the DTA for the recovery of withholding tax paid in relation to the Dutch Transactions (the "**PP Notice**") together with copies of any other relevant communications received from the DTA; MCM agrees to defer payment of the Indemnified Sum until such time as either the DTA makes a final determination of any challenge as regards the legality of the PP Notice or, and at MCM's sole discretion, MCM determines that for whatever reason any existing challenge or envisaged challenge of the PP Notice no longer has any prospect of success.

If your client is wishes to accept this proposal it must return the signed power of attorney by 4pm on 22 April 2020.

Absent such receipt your client is requested to:

A.  make payment of the Indemnified Sum as demanded above; or
B.  provide details of English solicitors who are instructed to accept service of proceedings in relation to our client's claim for the Indemnified Sum.

Yours faithfully

**ROSENBLATT**

4

2962983

....../5

**Appendix A**

| Share | Dividend Payment Date | Holding | Withholding tax claim (€) |
|---|---|---|---|
| KPN NA | 20.04.2016 | 1,250,000 | 9,375.00 |
| UNA NA RT | 07.12.2016 | 18,668,889 | 896,386.71 |
| UNA NA RT | 15.03.2017 | 17,891,250 | 859,048.37 |
| SBMO NA RT | 12.05.2017 | 1,350,000 | 43,719.75 |
| ABN NA RT | 23.06.2017 | 1,054,624 | 69,605.25 |

2962983

# Appendix B

# Relevant correspondence from the DTA

**Belastingdienst**

Belastingdienst, Postbus 2865, 6401 DJ Heerlen

THE BANK OF NEW YORK MELLON SA/NV
PICCADILLY GARDENS 1
GB M1 1RN MANCHESTER ENGELAND
GROOT-BRITTANNIE

**Kantoor Bu**
Dividendbel
Kantoor Hee

Kloosterweg 22
6412 CN Heerlen
Postbus 2865
6401 DJ Heerlen
www.belastingdie

**Doorkiesnumm**
+31 88 154 27 6

**E-mailadres**
a.van.roekel@be

**Datum**
31 oktober 2019

**Team**
C-W-D-1

**Behandeld doo**
A. van Roekel

**Onze referentie**
N047

Betreft: intended additional levy

Dear Sir/Madam,

On behalf of the following beneficiary (further "the fund"), THE BANK OF NEW YORK MELLON LONDON BRANCH filed the following reclaim(s):

| Beneficiary | Share name | Date dividend payment | Reclaim amount | Date decision Dutch tax authorities |
|---|---|---|---|---|
| CASTING PENSIONS GROUP TRUST | KPN | 20-04-2016 | €9.375 | 09-05-2016 |
| CASTING PENSIONS GROUP TRUST | UNILEVER | 07-12-2016 | €896.386,71 | 10-01-2017 |
| CASTING PENSIONS GROUP TRUST | UNILEVER DRIP | 15-03-2017 | €859.048,37 | 03-04-2017 |
| CASTING PENSIONS GROUP TRUST | SBM Offshore DRIP | 12-05-2017 | €43.719,75 | 01-09-2017 |
| CASTING PENSIONS GROUP TRUST | ABN AMRO Group DRIP | 23-06-2017 | €69.605,25 | 01-09-2017 |

Since the reclaims filed by this fund appeared to be relatively high and the funds appeared to be small we investigated all the reclaims filed by the fund. With this letter I inform you of our intention to impose an additional levy to the BNY Mellon for the amount of the above reclaims plus interest.

*The fund has limited assets*

The fund is a so called group trust. Group trusts are a kind of CIF that enable exempt trusts (these are called the group trusts "participating trusts") in the united States to be pool their assets. A group trust is exempt in the United States if it fulfils the conditions of revenue ruling 81-100 (and subsequent modifications).

The fund is established in 2011 together with three other group trusts: Casting Pensions Group trust, Industrial pensions Group trust and Central Technologies Pensions Group trust (further "the funds"). Until December 14, 2017 Bernard Tew has been the trustee of the fund.

From the information provided by the present trustee of the fund, Gordon Mullis, it follows that the fund had a small amount of assets to invest. The trustee of the fund is not able to provide annual accounts because he claims there is no legal obligation for a group trust to make annual accounts. Nevertheless the fund filled reclaims for an amount of 44,04,743.00 Danis Kronen in Denmark and for an amount of 2.347.569,35 euro in the Netherlands from 2012.

An additional levy has been imposed on the fund for a reclaim filled in 2012. In relation to this reclaim the Dutch tax inspector asked the Dutch representative of the fund to explain how the fund was able to file such large amounts of reclaims.

> "As you mentioned correctly in your letter, the Group Trusts do not have a large group of beneficiaries. In 2012, each Group Trust had between one and four participants. The ultimate beneficiaries of the pension plans (the participants) were all US citizens. If you look at the Adoption Agreements for, say Casting, you should be able to see the terms on which the IRA's adopted the group trust."

The Dutch tax advisor of the fund has been able to show that the fund had four participating trusts from May 22, 2012:

- Fourslides Pension Plan
- Hillsdale Hourly Pension Plan
- Hillsdale Salaried Pension Plan
- Revstone Casting Fairfiel GMP Local 369 Pension Plan

In 2011 and 2012 the management of these four pension funds was also carried out by Mr Bernard Tew. Based on the participating agreements these four pension plans committed themselves to invest various amounts via the fund in two other investment funds called the: CSTA Investment Fund en in GTA Investment Fund. Together the four funds invested an amount of about 600.000 dollar via the fund.

In a court case of the department of labor[1] about the management of the four pension funds Bernard Tew stated (**annex 1**):

> "47. <u>Looking to further diversify the Plans portfolio while protecting Plan assets and complying with ERISA, beginning 2011, I facilitated investments on behalf of the Plans in a complex European tax arbitrage strategy that consistently generated high rates of return for the Plans, while hedging risk.</u> This strategy provided a 200 to 800 percent return for the Plans in 2012." [underscore has been added by Dutch tax inspector]

Based on another participating agreement it seems that in April 11, 2012 another group trust, the MSJJ Retirement Group Trust, managed by Bernard Tew,

---

[1] https://www.dol.gov/newsroom/releases/ebsa/ebsa20151212

**Kantoor Buiten**
Dividendbelastin
Kantoor Heerlen

**Datum**
31 oktober 2019

**Onze referentie**
N047

participated in the fund. The Participating trusts in the MSJJ Retirement Group Trust were four ROTH IRA's of the wife and children of Bernard Tew[2].

The first four pension plans have been terminated in 2013 and 2014 and therefore from at least 2014 onward did not hold any participating interest in the fund[3]. On March 31, 2014 the Julian Ryan IRA (an so called individual retirement account) became Participating trust of the Group Trust. Based on the participating agreement the Michael B. Cohen IRAT subscribed for 7.000 dollar in the fund.

Based on the foregoing, the amount of capital contributed in the fund by its participating trusts cannot have been much more than 7.000 dollar from 2014 onward.

*Trading via ED&F Man*
BNY Mellon claimed the fund held its position via ED&F Man Capital Markets Ltd (further ED&F). During the year 2014 and 2015 the fund together with 36 other United States pension plans also filled refund requests in Denmark for Danish dividends they claimed to have received through their positions held via ED&F. The Danish tax authorities, SKAT, holds the opinion the pension plans did not in fact hold the shares it represented to SKAT that it owned, and had no dividend tax withheld. Because of this SKAT has filled an complaint at the US court in order to get its money back (**Annex 2**).

In the court case filled by SKAT in the United States a third party complaint has been filled by a number of the 36 pension plans against ED&F Man Capital Markets Ltd (further ED&F). In their complaint the pension plans state the following (**annex 3**):

   a. "In 2012, the Plans and ED&F executed various agreements (the 'Agreements') that set forth ED&F's obligations as broker-custodian for each of the Plans. The Agreements include each Plans' Custody Agreement, Security and Set-Off Deed, ISDA Master Agreement, and Terms and Condition of Business, with variations thereto."
   b. "Pursuant to the Agreements, the Plans have maintained separate brokerage accounts with ED&F since at least June 2012."
   c. "At all relevant times, ED&F managed and controlled brokerage accounts for the Plans, executed trades in Danish securities for the Plans, provided documentation and information to the Plans in connection with the Plans' accounts and securities transactions, and collected fees in connection with the Plans' withholding-tax refund requests."

Kantoor Buitenl:
Dividendbelasting
Kantoor Heerlen

**Datum**
31 oktober 2019

**Onze referentie**
N047

---

[2] Incidentally, from document available on court listener (Simpson v. Gayheart (1:18-cv-08673)) it follows that this group trust is now involved in a court case in the United States for a swap agreement it concluded at the end of 2016. Under the SWAP agreement, Simpson Master Investments Limited paid an amount of $ 3 million to MSJJ trust, which amount may be used by the MSJJ trust to trade for its own account and risk. In exchange for the amount of 3 million, the MSJJ trust undertakes, on the basis of the SWAP, to repay the amount of 3 million on the valuation date and to pay an agreed part of the proceeds that the MSJJ trust earned by investing the $ 3 million. The MSJJ trust has deposited the 3 million dollar amount into various group trusts with the aim of conducting dividend tax arbitrage in various jurisdictions in Europe (Holland, Denmark and Belgium). The MSJJ trust now is unable to repay.
[3] You can find information about the plans on https://www.pbgc.gov/search-all?key=Revstone%20Casting%20 Termination seems to be initiated by the pension benefit guaranty corporation: https://www.pbgc.gov/sites/default/files/legacy/docs/lfad/Metavation_4042%20Action_All%20Plans_FINAL.pdf



d.   "On information and belief, ED&F was the only entity that had direct control over the information concerning, among other things, the Plans' brokerage accounts, securities in those accounts, receipt of dividends, and entitlement to dividend withholding taxes."

**Kantoor Buitenl:**
Dividendbelasting
Kantoor Heerlen

**Datum**
31 oktober 2019

**Onze referentie**
N047

ED&F man has tried to make the court dismiss the third party complaint. In opposition to the motion of ED&F one of the pension plans, the GOLDSTEIN LAW GROUP PC 401(K) PROFIT SHARING PLAN (further "Goldstein plan") filed a memorandum in opposition. In this memorandum Goldstein plan states (**annex 4**):

e.   "Throughout 2014 and 2015, MCM Ltd.'s [tax inspector: this is ED&F] Equity Finance desk solicited and sold to the Manhattan-based Plan "customized equity finance solutions" whereby MCM Ltd. structured and facilitated the Plan's tax-favoured acquisition of Danish dividends by finding and funding the Plan's Danish securities transactions."

f.   "But MCM Ltd. neglected to mention that many, if not all, of the Plan's acquisitions were funded by MCM Ltd.'s very own affiliate, Volcafe Ltd. ("Volcafe"). MCM Ltd. induced the Plan to trade Danish securities so that MCM Ltd. could earn significant fees—and its affiliate charge materially above-market interest rates."

g.   "ED&F Man also owns Switzerland-based Volcafe Ltd. ("Volcafe"), a coffee trader that purports to provide coffee beans for 50 billion cups of coffee per year. ED&F Man, Volcafe: The World's Best Coffee Partner, edfman.com/commodities/coffee."

h.   "From 2012 to 2015, MCM Ltd. traded Danish securities for the benefit of at least 36 American pension plans, including the Goldstein Plan, and created 420 tax vouchers for those plans' submission to SKAT (the "Danish Dividend Transactions")."

i.   "In fact, MCM Ltd.'s Equity Finance desk solicited and sold these "customized equity finance solutions" to the Plan throughout 2014 and 2015."

j.   "Throughout 2014 and 2015, the seasonal nature of the coffee business caused Volcafe to periodically have large cash reserves necessary to purchase raw coffee beans at a later date."

k.   "Eager to put Volcafe's cash to better use, ED&F Man, MCM Ltd., and Volcafe devised, structured, and sold the Danish Dividend Transactions to MCM Ltd.'s U.S. pension plan clients, including the Plan."

l.   "By this self-dealing, MCM Ltd. extracted materially higher fees from its American pension plan clients than what would otherwise have been possible or commercially-reasonable under prevailing market conditions and interest rates."

m.   "MCM Ltd. arranged and executed the securities transactions relevant to all nine of the Plan's Reclaim Applications."

In a declaration of Kari Parks mentioned, an associate of the law firm Gusrae Kaplan Nusbaum PLLC ("GKN") that represents GOLDSTEIN LAW GROUP PC 401(K) PROFIT SHARING PLAN, Kari Parks declares (**annex 5**):

n.   In 2014 and 2015, MCM Ltd.'s "customized equity finance solutions" for the Plan included Danish securities transactions designed to profit from the Danish Withholding Tax Act Convention and Protocol Between the United States and Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, U.S.–Den., art. ¶¶ 10(3)(c), 22(2)(e), May 6, 29148, S. Treaty Doc. No. 106-12 (effective date Jan. 1, 2001) (the "Double-Taxation Treaty"). MCM Ltd.



created, structured, and solicited all of the transactions, and created their
accompanying tax vouchers, at issue in this case. [underscore by Dutch
tax inspector]

o. In 2014 and 2015, MCM Ltd. solicited the Plan to purchase Danish
securities and created and structured the transactions, arranging not only
the purchases and sales of the securities, but also their offsetting hedging
positions and financing.

p. On multiple occasions, Volcafe supplied both the financing of the Plan's
purchases and the securities to be purchased, themselves. [underscore by
Dutch tax inspector]

**Kantoor Buiten**
Dividendbelastin
Kantoor Heerlen

**Datum**
31 oktober 2019

**Onze referentie**
N047

Besides the American court cases, SKAT also filed a lawsuit against ED&F in the
UK. In this lawsuit SKAT's primary complaint against ED&F is negligence. In its
defence to the complaint ED&F states the following (**annex 6**):

q. By means of a power of attorney ("the power of attorney") the PP [inspector
PP stands for pension plan] would: (1) appoint an investment manager ("the
investement manager"); and (2) authorise the Investement Manager (inter
alia) to take all actions required to conduct trading in equities and/or other
financial instruments and to reclaim any deducted taxes in the name of and
on behalf of the PP;

r. From time to time each of the Danish Listed Companies would make a
"declaration" ("the Declaration Date") as to the gross dividend rate and
payable currency in relation to specified shares, which Declaration would be
published by Bloomberg approximately one month prior the reference date
on which the holder of a dividend-bearing share had the right to receive a
dividend ("the Rference Date")

s. The period between the Declaration Date and the Reference Date would
give rise to a window ("the Dividend Window") in which the PP could acquire
the shares in respect of which the dividend was payable ("the Security")

t. On a date on or prior to the Reference Date ("the Trade Date"), ED&F man
would (1) (upon instruction from the PP's Investment Manager) purchase the
Security by means of an over-the-counter transaction; or (2) acquire the
Security pursuant to an industry standard stock lending arrangement known
as the Global Master Securities Lending Arrangement ("the GMSLA"); (3) on
a principal to principal basis, on sell the Security to the PP; and (4) enable
the PP to enter into a transaction to hedge the risk of adverse market
movements in the value of the Security ("the Hedge"); alternatively [...] on
the Trade Date the PP would recall the Security by way of redelivery of
equivalent securities pursuant to the terms of a GMSLA.

u. From the Trade Date [...] ED&F Man would (a) hold the Security as a bare
trustee on behalf of the PP in the Custody Account; and (b) hold a charge
over the Security[4] and the Custody Account

v. On an agreed date after the Trade Date ("the Settlement Date", ED&F Man
would (1) pay for the Security on behalf of the PP (and debit the PP's
Custody Account in that sum); (2) on-sell or loan the Security on behalf of
the PP (and credit the PP's Custody Account accordingly)

w. The allegation [by SKAT] that the Relevant WHT Applicants "...did not have
the assets to make the very substantial investments..." misunderstands the
nature of the financial brokerage services provided by ED&F Man [....] In
particular were a PP did lack assets ED&F Man extended short term
credit to the PP in order to facilitate the acquisition of the Security as
follows:

   27.3.1. [..] from the moment of ED&F Man's acquisition of the
   Security on the Trade Date on behalf of the PP [...] ED&F Man (1)

---

[4] Dutch tax inspector: this means ED&F has proprietary interest



held a fixed charge over the Security and the PP's Custody Account
with ED&F Man; and (2)  was protected against market movements
in the value of the Security by the Hedge;
27.3.2 [...] following (1) ED&F Man's payment (on the Settlement
Date) for the Security and the debit of that amount to the PP's
Custody Account (2) the Security was on sold in the Market for a
sum of money which was then credited to the PP's Custody Account
(and which substantially reversed the debit);[5]

It was in these circumstances that the PPs did not need to have (1)
the assets necessary to make "very substantial investments";
and/or (2) the means to "afford" the purchase of the relevant
security. Instead ED&F Man, fully secured and protected against
market movements, was prepared to (and did) enable the PPs to
acquire Security (and, for the avoidance of doubt, no third party
provided any funding or collateral)." [underscore added by Dutch
tax inspector]

**Kantoor Buitenla**
Dividendbelasting
Kantoor Heerlen
**Datum**
31 oktober 2019
**Onze referentie**
N047

In a remarkable turn of events ED&F filled in September 2019 an amended
defence in which it admitted that 80 of the total of 420 tax vouchers issued to the
36 pension plans were false, including 64 where the pension plans suffered no
withholding tax at all. In its amended defence ED&F also amended several of its
previous statements including the ones given above and now stated (amongst
other things) **(annex 7):**

    x.  On a date on or prior to the Reference Date ("the Trade Date"), ED&F man
would (1) (upon instruction from the PP's Investment Manager) purchase the
Security by means of an over-the-counter transaction; ~~or (2) acquire the
Security pursuant to an industry standard stock lending arrangement known
as the Global Master Securities Lending Arrangement ("the GMSLA");~~ (3) on
a principal to principal basis, on sell the Security to the PP; and (4) enable
the PP to enter into a transaction to hedge the risk of adverse market
movements in the value of the Security ("the Hedge"); alternatively [...] on
the Trade Date the PP would recall the Security from ED&F Man by way of
redelivery of equivalent securities pursuant to ED&F Man's obligation to
replace securities provided by the PP to ED&F Man as financial collateral
~~the terms of a GMSLA~~.

    y.  On an agreed date after the Trade Date ("the Settlement Date", ED&F Man
would (1) pay for the Security on behalf of the PP (and debit the PP's
Custody Account in that sum); (2) on-sell ~~or loan~~ the Security on behalf of
the PP or (2) exercise its right to use and dispose of the Securities in
discharge of the PP's obligation to make payment (and credit the PP's
Custody Account accordingly)

Goldstein reacted to this news by asking leave to file an amended third party claim
to ED&F and stated **(annex 8):**

    z.  "ED&F Man has pleaded several new facts that gravely concern the
Goldstein Parties. Most important, ED&F Man alleges—for the very first
time—that several of the tax vouchers that it prepared for the Goldstein
Parties were inaccurate, thereby implying that the Goldstein Parties did not

---

[5] Remark tax inspector: this seems to be ED&F 's general, and somewhat misleading,
description of the example of the Hansen Holding A/S transaction described above by the tax
inspector. This shows that the example of the Hansen Holding A/S transaction is not an
incident but normal procedure of ED&F to provide the accounts of the pension funds with
shares on record date.

**Kantoor Buitenl:**
Dividendbelasting
Kantoor Heerlen

**Datum**
31 oktober 2019

**Onze referentie**
N047

own the relevant Danish securities and did not receive their concomitant dividends. In other words, ED&F Man admits that it prepared and provided the Goldstein Parties with false documents—including false trade confirmations and brokerage statements—upon which ED&F Man knew both the Goldstein Parties and SKAT would rely in applying for and approving Danish tax refunds." [underscore by Dutch tax inspector]

aa. "Accordingly, we advise the Court that the Goldstein Parties intend to soon move this Court for leave to file a Second Amended Answer, Counterclaims, and Third-Party Complaint alleging additional claims against ED&F Man, including fraud."

Now, based on the limited size of the fund, the amounts of the reclaims, the amount of money needed to buy the shares/ADR and the above information and testimonies it seems to me likely ("aannemelijk") that:

- ED&F bought the shares OTC or loaned the shares, and
- The fund bought the shares/ADR from ED&F or its affiliate Volcafe, and
- (immediately) sold the shares back to ED&F or its affiliate Volcafe, and/or
- The fund received any means needed to buy the shares/ADR from ED&F or its affiliate Volcafe, and
- The fund hedged any risk with ED&F, and
- ED&F had at all times a charge on the securities.

The above view is confirmed by the information we received from both BNY Mellon and Globetax which, although very incomplete and vague, confirms that as a rule share were bought shortly before the ex date and sold on or shortly after record date and were as a rule hedged with ED&F[6]. The view is also confirmed by an account equity statement of January 24, 2017 provided by the Dutch tax advisor of the fund in which shows, amongst other things, that the total value of the equity of the fund in its account according to ED&F had an (based on the size of the fund) unbelievable value of 509,083,191.56 dollar at that date. Further, based on ED&F's testimony I conclude that it must have been ED&F who had at all times control over the shares, since it is inconceivable that professional party, such as ED&F, would be willing to fully hedge substantial risks with a fund with very low solvency while the fund might (assuming for the sake of argument that the fund has control), choose not to sell the shares back to ED&F but keep them as long as they choose or short sell them etcetera (in case of a short sale the downward risk for ED&F would be very considerable indeed).

To conclude: the fund only appeared to be the one who traded, controlled and (beneficially) owned the shares/ADR in its investment account, but in reality the trades where set up, executed and financed by ED&F and the shares/ADR were acquired by ED&F and ED&F was the one who (beneficially) owned the shares and ED&F was the one who had at all times the control over the shares in the account of the fund. Therefore, without well documented proof to the contrary, we conclude that the fund did not have a right to the refunds based on article 35 of the tax treaty. This means the refunds have been granted wrongly and should be repaid by MNY Mellon pursuant to the special arrangement it has with the Dutch tax authority.

*Additional considerations for reclaims concerning dividend rights*

---

[6] Although up till now neither Globetax, BNY mellon or ED&F or the fund has been willing or able to produce the contracts for the hedges, so that it remains highly doubtful if in actual fact the hedging took place. This leaves open the possibility that all transactions were mere administrative exercises of shares that were moved at will by ED&F between different accounts of ED&F.

Kantoor Buitenl:
Dividendbelasting
Kantoor Heerlen

Datum
31 oktober 2019

Onze referentie
N047

Concerning the last three reclaims in the above table it follows from the information provided by BNY Mellon that the fund did not hold the specific shares on record date. Nevertheless the BNY Mellon filled reclaims for these three events because BNY Mellon claims the fund received payment for its possession of dividends rights that belong to a dividend reinvestment plan that is organised by ABN AMRO Bank NV. In my view any payment the fund received for its possession of dividend rights does not qualify as a dividend since the fund did not hold the shares on record date.

On July 21, 2016 Unilever NV announced a dividend to be paid on March 15, 2017 to:

"Holders of shares resp. depositary receipts receive the dividend through the bank or broker where their documents are in administration on 10 februari 2017 at the close of business." [translation from Dutch tax inspector][7]

On April 13, 2017 SBM Offshore NV announced a dividend to be paid on May 12, 2017 to:

"all shareholders of record as at April 20, 2017 through the bank or broker administering the shares."

We cannot find the dividend announcement of ABN AMRO Bank NV for the dividend of June 23, 2017. However, in its announcement concerning the dividend reinvestment plan ABN AMRO Bank NV states:

"The Plan will enable holders of ABN AMRO Group DRs ("DR holders") [in the paragraph above the AMB AMRO Banks explains DRs means holder of Depository receipt, that is: "certifikaten van aandelen"] to reinvest their cash dividend of EUR 0.374 net per ABN AMRO Group DR. The Company is supportive of the Plan.

The Plan will only be available to those DR holders who (i) hold their entitlements through a member of Euronext in Amsterdam (each a "Member" and together, the "Members") and (ii) expect to receive dividends for ABN AMRO Group DRs and (iii) are holders of ABN AMRO Group DRs on 2 June 2017 at 17.40 CET ("Record Date")."

From all these statements it follows that these companies intended and expected the dividends to be paid by the intermediaries to the persons that held shares on the respective record dates. However, from the information provided to me by BNY Mellon it follows that the fund did not hold shares/depositary receipts on the record dates. Therefore the fund cannot have received a dividend from these companies.

It can also not be maintained that the beneficiary had a right to a reclaims because it may have received payments from BNY Mellon for its possession of the "dividend rights". The reason is that such a payment cannot lawfully have been paid by BNY Mellon on behalf of Unilever NV. Unilever NV intended their dividend to be paid to the holders of shares on record date. If an intermediary pays the

---

7

https://www.securitiesinfo.com/post/365198/Unilever/Dividend/eyJjb21w
YW55IjoiMTQwIiwiYXJjaGGl2ZWRDb21wYW55IjoiLTEiLCJzdWJncm91cCI6IiI
sImNhdGVnb3J5IjoiiwiaXNpbiI6IiIsInN5bWJvbCI6IiIsInNlY3VyaXR5IjoiIiw
ic3RhcnRkYXRlIjoiIiwiZW5kZGF0ZSI6IiIsIm9yZGVyIjoiIiwiZXh0cmFfc3ViZ
3JvdXAiOiIiLCJvZmZzZXQiOiIiOiI0NSJ9

dividend it receives from Unilever NV to another party, this payments cannot have been done on behalf of Unilever NV. Therefore, any payment the beneficiary received for its possession of "dividend rights" cannot have been a dividend from Unilever NV.

**Kantoor Buitenl**
Dividendbelasting
Kantoor Heerlen

**Datum**
31 oktober 2019

**Onze referentie**
N047

Further, there is a real possibility that the person who did hold the shares/depositary receipts on record date may also have filed a reclaim. The reason for this is that the "dividend rights" may have been sold by a financial intermediary (An intermediary such as ED&F) to the fund without shareholder being aware of this fact. The financial intermediary would in this case be able to pay the shareholder the net dividend from the proceeds it receives from the fund. The shareholder may then rightly assume that it is the one who has a right to the reclaim. This scheme may be visualised as follow[8]s:



Therefore, in order to exclude the possibility of a double refund BNY Mellon should at least clarify from who and under what conditions the fund bought the dividend rights.

**Intended additional levy and questions**
Based on the above I intend to impose an additional levy on the Bank of New York Mellon for the above reclaim amounts plus interest. Further I request you provide me with the following information:

1. Documented proof that shows that the fund bought the shares/ADR/dividend rights (contracts or e-mails with the counterparty of the OTC transactions would constitute proof but an excel file would not).
2. Specify (and provide proof) from who the fund bought the shares/ADR/dividend rights.
3. Specify (and provide proof) to who the fund sold the shares/ADR/dividend rights.
4. Show how the fund financed its acquisition. Show this by providing relevant documents such as option contract (with signature and counterpart), official bank account statements, transaction reports (no excel files), loan contracts ect. Did the fund conclude any contract in order

---

[8] The visualisation is simplified since it may very well be the case that the financial institution who sells the dividend rights is not the same financial institution as the one that receives the payment from the CSD.



to get additional cash in order to buy the dividend rights? If so, explain and provide documented proof.

5.  Specify the price for which the shares/ADR/dividend rights have been bought.

6.  Specify the price for which the shares/ADR have been sold.

7.  Provide documented proof if and to what extend the fund acquired shares/ADR with funds of its own and if and to what extend the fund assumed any risk for the price movement of the shares/ADR.

8.  Provide bank account statements of the fund that show all payments from the fund to ED&F and from ED&F to the fund.

9.  Provide the power of attorney by which the fund appointed an investment manager.

10. Provide all agreements of the fund with ED&F (from the above testimony these should include, but not be limited to a: Custody Agreement, Security and Set-Off Deed and the ISDA Master Agreement).

**More information**
Do you still have questions? Please call me on my direct number +31 88 154 27 60. You can also e-mail to a.van.roekel@belastingdienst.nl. Conditions apply for using e-mail. Check out 'Contact' at www.belastingdienst.nl.


Yours sincerely,


on behalf of the Tax Inspector


A. van Roekel, LL.M.

**Kantoor Buitenl:**
Dividendbelasting
Kantoor Heerlen

**Datum**
31 oktober 2019

**Onze referentie**
N047

**Verzoek om terugbetaling/**

**Naheffingsaanslag**

Dividendbelasting

Belastingdienst/Kennis- en Expertisecentrum Buitenland

> Postbus 2865  6401 DJ  Heerlen Nederland

THE BANK OF NEW YORK MELLON SA/NV
1 PICCADILLY GARDENS
MANCHESTER M1 1RN
GROOT-BRITTANNIË

**Verzoek om terugbetalingsnummer/**
**aanslagnummer**
2020.193.006.03006

**Dagtekening**
7 februari 2020

Ontvanger: Belastingdienst/kantoor Buitenland
Rekeningnummer: NL49 INGB 0000 4410 70
BIC INGBNL2A onder vermelding van "dividendbelasting" en het
verzoek om terugbetalingsnummer/aanslagnummer

**Jaar**
2016
**Uw kenmerk**
PSS6900188590QTR568125
PSSNL0000009355G00000568125
**Klantnaam**
THE BANK OF NEW YORK MELLON SA/NV
**Ons kenmerk**
NA047

Inspecteur: Belastingdienst/Kennis- en Expertisecentrum
Buitenland

**Verzoek om terugbetaling/**
**Naheffingsaanslag** wegens teveel
ontvangen dividendbelasting

€ 1.019.786,71

**Te betalen:**

**€ 1.019.786,71**

**Berekeningsgegevens**
**Verzoek om terugbetaling/**
**naheffingsaanslag** teveel ontvangen
dividendbelasting

Enkelvoudige belasting
€ 905.761,71

Rente
€ 114.025,00

Totaal bedrag
€ 1.019.786,71

Betaling binnen drie weken na dagtekening van dit verzoek om terugbetaling/deze aanslag. Vermeld bij
correspondentie over het verzoek om terugbetaling/de aanslag altijd het verzoek om
terugbetalingsnummer/aanslagnummer. Zie voor meer informatie over betalen de bijgevoegde
toelichting.



## TOELICHTING OP HET VERZOEK OM TERUGBETALING/ DE NAHEFFINGSAANSLAG

Het verzoek om terugbetaling/de naheffingsaanslag wordt opgelegd om de belasting waarvoor een te hoog bedrag aan teruggaaf is verleend, alsnog te innen op grond van artikel 20 van de Algemene wet inzake rijksbelastingen (AWR).

### BETALINGSWIJZE
Maak het bedrag over op rekeningnummer NL49 INGB 0000 4410 70, BIC INGBNL2A van Belastingdienst/Kantoor Buitenland onder vermelding van 'dividendbelasting' en het verzoek om terugbetalingsnummer/aanslagnummer. Dit nummer staat op het verzoek om terugbetalingsbiljet/aanslagbiljet.
U ontvangt binnenkort een acceptgiro, deze kunt u als niet verstuurd beschouwen.

### BETALINGSTERMIJN
Het verzoek om terugbetaling/de aanslag moet u betalen binnen 3 weken na de dagtekening. De dagtekening staat op het verzoek om terugbetaling/de aanslag. Als u niet tijdig betaalt, dan zal de ontvanger invorderingsmaatregelen treffen.

### INLICHTINGEN
Voor meer informatie over dit verzoek om terugbetaling/deze aanslag, zoals de berekening van de verzoek om terugbetaling/naheffingsaanslag, kunt u terecht bij de inspecteur die op het verzoek om terugbetaling/de aanslag vermeld staat.

### BEZWAAR
Als u het niet eens bent met het verzoek om terugbetaling/de naheffingsaanslag, kunt u binnen zes weken na de dagtekening op het verzoek om terugbetalingsbiljet/aanslagbiljet een bezwaarschrift indienen bij de inspecteur die op het verzoek om terugbetaling/de aanslag vermeld staat. Indien u niet in staat bent geweest tijdig een bezwaarschrift in te dienen, dan kan de inspecteur u informeren hoe dan te handelen.

Een ingediend bezwaarschrift wordt door de Belastingdienst gezien als een verzoek om uitstel van betaling voor het bestreden bedrag.

*Vermeld in uw correspondentie altijd het verzoek om terugbetalingsnummer/aanslagnummer van het aanslagbiljet.*

**Verzoek om terugbetaling/**

**Naheffingsaanslag**

Dividendbelasting

Belastingdienst/Kennis- en Expertisecentrum Buitenland
> Postbus 2865  6401 DJ  Heerlen Nederland

THE BANK OF NEW YORK MELLON SA/NV
1 PICCADILLY GARDENS
MANCHESTER M1 1RN
GROOT-BRITTANNIË

**Verzoek om terugbetalingsnummer/**
**aanslagnummer**
2020.193.006.03007

**Dagtekening**
7 februari 2020

Ontvanger: Belastingdienst/kantoor Buitenland
Rekeningnummer: NL49 INGB 0000 4410 70
BIC INGBNL2A onder vermelding van "dividendbelasting" en het
verzoek om terugbetalingsnummer/aanslagnummer

**Jaar**
2017
**Uw kenmerk**
PSS568125NL0000360618PD12.05.2017
PSS568125NL0012191704PD23.06.2017
PSS2170822356479
**Klantnaam**
THE BANK OF NEW YORK MELLON SA/NV
**Ons kenmerk**
NA047

Inspecteur: Belastingdienst/Kennis- en Expertisecentrum
Buitenland

**Verzoek om terugbetaling/**
**Naheffingsaanslag** wegens teveel
ontvangen dividendbelasting

€ 1.055.889,37

**Te betalen:**

**€ 1.055.889,37**

**Berekeningsgegevens**
**Verzoek om terugbetaling/**
**naheffingsaanslag** teveel ontvangen
dividendbelasting

Enkelvoudige belasting
€ 972.373,37

Rente
€ 83.516,00

Totaal bedrag
€ 1.055.889,37

Betaling binnen drie weken na dagtekening van dit verzoek om terugbetaling/deze aanslag. Vermeld bij
correspondentie over het verzoek om terugbetaling/de aanslag altijd het verzoek om
terugbetalingsnummer/aanslagnummer. Zie voor meer informatie over betalen de bijgevoegde
toelichting.

## TOELICHTING OP HET VERZOEK OM TERUGBETALING/ DE NAHEFFINGSAANSLAG

Het verzoek om terugbetaling/de naheffingsaanslag wordt opgelegd om de belasting waarvoor een te hoog bedrag aan teruggaaf is verleend, alsnog te innen op grond van artikel 20 van de Algemene wet inzake rijksbelastingen (AWR).

### BETALINGSWIJZE
Maak het bedrag over op rekeningnummer NL49 INGB 0000 4410 70, BIC INGBNL2A van Belastingdienst/Kantoor Buitenland onder vermelding van 'dividendbelasting' en het verzoek om terugbetalingsnummer/aanslagnummer. Dit nummer staat op het verzoek om terugbetalingsbiljet/aanslagbiljet.
U ontvangt binnenkort een acceptgiro, deze kunt u als niet verstuurd beschouwen.

### BETALINGSTERMIJN
Het verzoek om terugbetaling/de aanslag moet u betalen binnen 3 weken na de dagtekening. De dagtekening staat op het verzoek om terugbetaling/de aanslag. Als u niet tijdig betaalt, dan zal de ontvanger invorderingsmaatregelen treffen.

### INLICHTINGEN
Voor meer informatie over dit verzoek om terugbetaling/deze aanslag, zoals de berekening van de verzoek om terugbetaling/naheffingsaanslag, kunt u terecht bij de inspecteur die op het verzoek om terugbetaling/de aanslag vermeld staat.

### BEZWAAR
Als u het niet eens bent met het verzoek om terugbetaling/de naheffingsaanslag, kunt u binnen zes weken na de dagtekening op het verzoek om terugbetalingsbiljet/aanslagbiljet een bezwaarschrift indienen bij de inspecteur die op het verzoek om terugbetaling/de aanslag vermeld staat. Indien u niet in staat bent geweest tijdig een bezwaarschrift in te dienen, dan kan de inspecteur u informeren hoe dan te handelen.

Een ingediend bezwaarschrift wordt door de Belastingdienst gezien als een verzoek om uitstel van betaling voor het bestreden bedrag.

*Vermeld in uw correspondentie altijd het verzoek om terugbetalingsnummer/aanslagnummer van het aanslagbiljet.*

# Appendix C

# Power of Attorney

## POWER OF ATTORNEY

**The undersigned:**

The undersigned, Casting Pensions Group Trust ("the Fund"), located in Kentucky, USA.

Gives power of attorney to ED&F Man Capital Markets Limited ("MCM"), located at 3 London Bridge Street, SE1 9SG, London, England

**who in turn gives power of attorney on behalf of the Fund to:**

(1) Thies Sanders, LLM and Gerhard Grauss, LLM, both attorneys at law in Amsterdam, both related to Loyens & Loeff N.V., attorneys at law, tax advisers, and civil law notaries; and (2) Rosenblatt Limited, English solicitors in London ("the Representatives"), to:

act and represent the Fund in filing a notice of objection with the tax inspector, filing appeals with the district court, filing appeals with the appellate court, and filing appeals with the Supreme Court of the Netherlands on behalf and for the Fund, regarding

supplementary levies (*naheffingsaanslagen*) or requests for repayment regarding dividend tax, issued by the Dutch tax authorities to the Fund

and further to do everything which the Representatives may consider necessary, with power of substitution.

The Fund hereby agrees that, in the event of a conflict arising between the interests of MCM and the Fund as determined by MCM, the Representatives will cease to act for the Fund and will continue to act for MCM.

This power of attorney is governed by Dutch law.

Signed in _____ on ___ April 2020.

Name:

Signature:

_____

Name:

Signature:

_____

Exhibit B



BLOOMBERG FINANCE L.P.
731 Lexington Avenue
New York, NY 10022

Exhibit C

**BLOOMBERG AGREEMENT**

| | | |
|---|---|---|
| SERVICE PROVIDER ("SP"): | BLOOMBERG FINANCE L.P. | ACCOUNT: |
| SERVICE RECIPIENT ("SR"): | GOLDEN ISLES TECHNOLOGY PENSION GROUP TRUST | AGREEMENT: |
| | (Company Name) | |

This Bloomberg Agreement (this "Agreement") is between **BLOOMBERG FINANCE L.P.** ("SP") and **GOLDEN ISLES TECHNOLOGY PENSION GROUP TRUST** ("SR"). Capitalized terms used in this Agreement are defined in Annex A.

1. The Services. SR agrees to subscribe for the BLOOMBERG TERMINAL® service (the "BTS") and all items, software and Equipment provided under or described in the attached Schedule(s) (collectively, the "Services"). The Services are provided to SR on a nonexclusive and nontransferable licensed basis.

2. Term and Termination. (a) The term of this Agreement (the "Term") begins on the date it is accepted by SP and ends when it is terminated in accordance with its provisions. The term of each Schedule (a "Schedule Term") is two years, beginning when Services are first provided thereunder. This Agreement or any Schedule may be terminated (i) by SR upon not less than 60 days' prior written notice to SP and (ii) by SP upon written notice to SR if SR breaches this Agreement. This Agreement may also be terminated by SP if no Schedules remain in effect hereunder. All Schedules terminate automatically upon termination of this Agreement.

(b) Each Schedule Term automatically renews for successive two-year periods unless SR or SP elects not to renew by giving not less than 60 days' prior written notice to the other. Charges payable during renewal periods will be at SP's prevailing rates as notified by SP to SR in advance, and each Schedule shall be deemed amended accordingly. Upon termination of this Agreement or any Schedule, the SP Group may remove Equipment at SR's expense. In addition, upon such termination, SR shall cease use of all terminated Services and Equipment.

(c) Upon termination of this Agreement for any reason whatsoever, SR shall (i) use its best efforts promptly to delete or purge all copies of the Items from all Systems (or effectively do so in a way that such Items cannot be accessed or used by any person) and (ii) immediately cease using all Items. SR may continue uses of Resultant Information permitted hereby following termination of this Agreement. Upon SP's request, SR shall provide SP with evidence satisfactory to SP of all required deletions, purges and cessations. Unless otherwise required by Suppliers of Additional Information or specifically required pursuant to the Agreement (A) SR shall not be required to cease using, delete or purge Information that is contained in Reports generated in compliance with paragraph 5(e) prior to termination, (B) SR shall not be required to cease using, delete or purge any SR-Developed Applications that are modified so that they do not accept the Information or Resultant Information as inputs and are not derived from, contain elements of, or use intellectual property contained in, the Materials and (C) SR may archive Information only as necessary to comply with regulatory or internal audit requirements, provided that such Information is made available only to Related Persons who are compliance officers, information technology professionals, legal professionals and accounting professionals of SR and only to the extent necessary for such purposes and requirements. At any time following termination, if SR finds any items on any of its Systems that were not deleted or purged in compliance with this paragraph, SR shall at that time promptly delete or purge such items. If, at any time during the Term, any Authorized Computer ceases, for any reason, to be an Authorized Computer, this paragraph shall apply to all Information and Resultant Information on any such Authorized Computer.

3. Charges. (a) SR agrees to pay the fees and charges set forth on each Schedule together with: (i) any applicable taxes for the Services; (ii) any fees or charges for Additional Information requested or ordered by SR (as such fees and charges may be changed from time to time, "Additional Information Fees"); (iii) any charges for installation, relocation, removal or any other changes to the Services; and (iv) any fees for additional functionality or software made available through the Services at SR's request, all of which shall be payable upon presentation of an invoice therefor.

(b) SR agrees that Additional Information Fees may be charged by Suppliers of Additional Information based on SR's access to and/or use of Additional Information, including on the basis of each computer, user or other factor (as set by such Suppliers) and that the basis of charging and amount of such fees may change upon notice. To the extent permitted by law, SP may send and SR agrees to receive invoices via electronic mail. If SR is tax-exempt, SR has previously delivered to SP a copy of SR's State/Foreign Tax Exempt Certificate.

(c) If this Agreement is terminated pursuant to paragraph 2(a)(i) or 2(a)(ii), SR shall pay all amounts due under paragraphs 3(a) and 3(b) through the date of termination plus a termination charge equal to 50% of the charges calculated in accordance with each Schedule for the balance of the Schedule Term(s). If any Schedule or any portion of the Services is terminated, SR shall pay all amounts due under paragraphs 3(a) and 3(b) through the date of termination with respect to the terminated Schedule or Services plus a termination charge equal to 50% of the charges calculated in accordance with the applicable Schedule and/or Services for the balance of the applicable Schedule Term(s).

4. Using the Services. (a) The Services and Equipment may be used only as permitted hereunder, not for any illegal purpose, solely for SR's internal business purposes, and only by SR and its Related Persons. SR shall ensure that all Related Persons comply with this Agreement and shall obtain from its Related Persons appropriate agreements regarding confidentiality and non-disclosure to prevent unauthorized disclosure and misuse during and after the Term. The Services may not be used for any development purposes

or to develop any applications that could otherwise interact or interface with any part of the Services. SR acknowledges that the Services were developed, compiled, prepared, revised, selected and arranged by the SP Group and its respective Suppliers through the application of methods and standards of judgment developed and applied through the expenditure of substantial time, effort and money and constitute valuable industrial and intellectual property and trade secrets of the SP Group and its respective Suppliers. SR acknowledges and agrees that it has no ownership rights in or to the Services and that no such rights are granted to SR hereunder. During and after the Term, SR shall comply with all written requests made by the SP Group or its respective Suppliers to protect their rights in the Services. SR agrees to notify SP in writing promptly upon becoming aware of any unauthorized access or use by any person or entity or any claim that any portion of the Services infringes upon any copyright, trademark, or other rights.

(b) The Services may not be accessed through any means not authorized by SP, nor may any medium by which the Services are provided be reproduced, shared, broadcast or otherwise copied or moved with or to any other equipment without SP's prior written consent. SP Group shall have no responsibility for SR Equipment. None of the SP Group shall be responsible for any delay or any other failure in the Services caused by SR Equipment. SR shall not use any part of the Services in any manner that SP, in its sole good faith judgment, determines could interfere with the Services. The SP Group and its respective Suppliers shall have all rights provided by law to prevent unauthorized access or use and to collect damages in such event. Except as permitted herein, SR shall not share, recompile, decompile, disassemble, reverse engineer, or make or distribute any other form of, or any derivative work from, the Services.

(c) The SP Group may make changes, enhancements or upgrades to the Services and related software, materials, guidelines and services from time to time in its discretion. SR shall take all reasonable steps to maintain compatibility with the Services. SR may not distribute data to other users of the Services by means of the Services except as permitted by SP. The previous sentence is not intended to prohibit SR's use of the message system included in the Services.

5. Using the Information. (a) Except as otherwise expressly permitted in this Agreement, Information and related Resultant Information may be used only for the benefit of the particular BTS subscription through which such Information was initially received, and not for enterprise use. Re-routing of Information, Resultant Information and/or any portion of the Services from any Receiving Device to any other device or medium is prohibited. Information and Resultant Information may not be used as inputs into any non-user-based, non-display application (e.g., automated algorithmic trading applications). In no event will SR permit Information or Resultant Information to be used in any way not specifically authorized by SP

(b) Bloomberg Anywhere. Bloomberg Anywhere (BBA) subscriptions are for individual use only and on one Receiving Device at a time. BBA Users may not access and/or use the BTS, Information or related Resultant Information on multiple devices simultaneously. Bloomberg Anywhere subscriptions may not be shared under any circumstances. Each BBA User shall access the Services only through (i) a standard unique BBA User login and password and (ii) a secure identification device, as required and provided by SP. All such secure identification devices shall be included in the term "Equipment." SR shall not permit Bloomberg Anywhere to be shared, switched or replicated between two or more persons or to be used to access the Services simultaneously from two or more devices, computers, workstations or locations. SR understands that (x) its Related Persons who are BBA Users may be able to access the Services via Receiving Devices located outside of SR's premises and (y) certain Bloomberg Anywhere functionality may differ based on the type of Receiving Device used. SR shall be responsible for all use of the Services by its Related Persons, regardless of where the Services are accessed. The Services, including Information received by a BBA User, all related Resultant Information created by such BBA User, and/or all such Information and related Resultant Information stored by such BBA User, are for the exclusive use of such BBA User. Except to the extent permitted by paragraph 5(e), BBA Users may not broadcast, redistribute, or otherwise move Information or Resultant Information to any person.

(c) Bloomberg Terminal. Bloomberg Terminal subscriptions are for use on a single Receiving Device. Each Terminal User shall access the Services only through (i) a standard unique Terminal User login and password and (ii) a secure identification device, as required and provided by SP. The Services, including all Information and Resultant Information, may only be used by Terminal Users on the Receiving Device associated with the applicable Bloomberg Terminal subscription, and may be stored only on the Receiving Device for such subscription. Except to the extent permitted pursuant to paragraph 5(e), Terminal Users may not broadcast, redistribute, or otherwise move Information or Resultant Information to, or use Information or related Resultant Information in any fashion on or by, any other device. Only one authorized Terminal User may access and/or use the BTS, any Information or related Resultant Information at any time.

(d) Downloaded Information. SR may receive certain Downloaded Information into Designated Authorized Computers of SR solely and exclusively for SR's internal business purposes on Designated Authorized Computers, including without limitation, as input to computer applications on such Designated Authorized Computers. Downloaded Information may not be used for resale or other transfer or disposition to, or use by or for the benefit of, any other person or entity. SR may use or access Downloaded Information only on or from the Designated Authorized Computer that received the Downloaded Information via the Services. In no event will SR permit any Downloaded Information to be reproduced, shared, broadcast or otherwise copied or moved to or used in any fashion on any device, display, application or printer or on any Authorized Computer other than the Designated Authorized Computer for such Downloaded Information. SR may store the Downloaded Information on the Designated Authorized Computer for such Downloaded Information, provided, however, that Authorized Computers, or users using such Authorized Computers, shall not access Downloaded Information that is being stored or used on a different Authorized Computer. For the avoidance of doubt, SR shall not store all or any part of the Downloaded Information in databases for access by any Authorized Computers other than the Designated Authorized Computer for such data. SR may access the Desktop API only from Authorized Computers that are logged onto the BTS. As reasonably requested by SP, SR agrees to produce a report to SP listing the number of Authorized Computers per location and the unique address of each Authorized Computer and any other information reasonably requested by SP from time to time. SP may

modify the amount and type of information made available via the Desktop API and the Services from time to time in its sole judgment.

(e) <u>Use of a Limited Amount of Information: Display Requirements</u>. In the ordinary course of its business, SR may use and disseminate a Limited Amount of Information or Resultant Information in published reports, whether in print or electronic form, to support the primary business of SR in (i) providing research for internal use or to its customers or (ii) making trade proposals (together, "Reports"); <u>provided, however</u>, that: (x) SR may not use or disseminate the Information or Resultant Information in any manner that could, in SP's sole good faith judgment, affect SP's ability to license the Information or cause the information so used or disseminated to be a source of or substitute for Information otherwise available from SP; (y) such use by SR of a Limited Amount of Information and/or Resultant Information shall not (I) result in or form any automated data validation or data verification activity whatsoever; (II) be part of a regularly scheduled or automated process; or (III) cause (or lead to) any Information or Resultant Information being streamed or broadcast; and (z) at no time shall any Information and/or Resultant Information be sold nor shall it be created, redistributed or delivered by any person other than the User that initially received such Information or generated such Resultant Information. When permitted to display or distribute Information, SR must identify such Information as follows: (A) any data contained in the Information contributed directly by SP must be identified as SP's data; and (B) any Additional Information contained in the Information shall be identified by the name of the Supplier or as otherwise required from time to time by the Supplier of such Additional Information. All Additional Information shall be displayed by SR in accordance with the rules of the relevant Supplier of such Additional Information. SR shall pass on all SP-provided system status messages to the Authorized Computers which are displaying any Information and Resultant Information.

(f) <u>Materials</u>. If SP or an affiliate provides any Materials to SR in connection with the Services, SR may use such Materials only (i) for its internal business purposes and (ii) internally to develop, modify or test SR-Developed Applications for SR's internal business use only in accordance with this Agreement and applicable SP policies (as they may be revised from time to time). SR shall not incorporate the Materials or any part thereof into SR-Developed Applications or use the Materials in any manner that would cause the Materials to become subject to any "open source license" that would impose obligations on the SP Group's use of the Materials or impair any rights of the SP Group thereto. SR may use SR-Developed Applications only for SR's internal business use in accordance with this Agreement and only to the extent such SR-Developed Applications (A) would not facilitate the breach of any agreement between SP and/or its affiliates and the user of such SR-Developed Application and (B) are otherwise consistent with relevant SP policies (as may be amended from time to time). SR may not under any circumstances distribute, disclose, transfer or otherwise make available the Materials, any SR-Developed Applications or any part thereof, to any third party. Except as expressly permitted herein, SR may not: (x) copy, adapt, recompile, decompile, disassemble, reverse engineer, or make or distribute, any other form of, or any derivative work created from, the Materials or any part thereof; or (y) modify, adapt, translate, rent, lease, loan, resell or network the Materials or any part thereof. If SR desires to have a third party develop software or applications on SR's behalf that accept the Information or Resultant Information as inputs, SR must ensure that such third party has entered into an appropriate third-party developer license with SP to obtain the necessary materials and to authorize such third party to perform such development on SR's behalf. If SR desires to obtain a limited functionality subscription to the BTS with limited access to data for development and internal monitoring purposes, SR must enter into an appropriate agreement with SP to obtain such development subscription. If SR desires to distribute SR-Developed Applications to any third party, SR must enter into an appropriate third-party developer license with SP that permits such distribution.

(g) <u>Protections</u>. Notwithstanding anything to the contrary herein, SR may not use, and may not permit or otherwise facilitate any third party to use, the Services, Information, any Resultant Information or related Resultant Information, or any portion thereof, in any way: (i) to improve the quality of data (including any data validation or data verification) provided in any manner by SR, any affiliate of SR or any other party to any third party; (ii) for any automated data validation or verification or (iii) in any manner that does or could compete with any business, product or service of SP or its affiliates including, but not limited to, any use that may: (x) result in the displacement of an existing subscription of, or the loss of a potential subscription by, a third party to the SP Group's information services including, without limitation, services with respect to Additional Information; (y) result in a reduction of SR's existing or potential subscriptions to the SP Group's information services, including but not limited to, the number of Authorized Computers or BTS subscriptions or licensees receiving the Information; or (z) prejudice the rights of SP, its affiliates or any sources of any part of the Information to exploit its respective portion of the Information. If SP believes in good faith that any business, service or product of SR competes with SP or its affiliates in the manner specified above, SP may terminate this Agreement, pursue any and all remedies in respect of such breach, and may require that SR immediately discontinue its use of the Information and Resultant Information and comply with the provisions of paragraph 2(c).

(h) <u>Third-Party Additional Information</u>. SR understands that (i) Suppliers of Additional Information may prevent or prohibit their Additional Information from being accessed at any time and (ii) SP may limit the quantity and/or type of Information made available as part of the Services. SR must comply with all requirements regarding use of Additional Information imposed by Suppliers of Additional Information (as such requirements may change from time to time), including without limitation any restrictions and requirements (x) set forth on or linked to the EIS<GO> function on the BTS or (y) contained in agreements between SR and Suppliers of Additional Information. SR hereby consents to the SP Group providing Suppliers of Additional Information data and information regarding SR's use of Additional Information. SR understands that Suppliers may choose at any time to inhibit or prohibit their information from being accessed via the Desktop API.

(i) <u>Access Points</u>. Access Points for any Bloomberg Anywhere subscriptions may be accessed only by Users of that subscription and access to any Bloomberg Anywhere subscription may not be shared with any person who is not a User with respect to such subscription. SR shall notify SP of the location of each Access Point upon SP's request. SP may remove or require SR to remove one or more Access Points for any Bloomberg Anywhere subscription that is terminated for any reason.

(j) <u>Bloomberg Flat Panel</u>. If SP provides SR with flat panel screens, SR agrees not to separate, unbolt, move, modify, interface, duplicate, redistribute or otherwise disconnect any such screens, or use any of the flat panel screens in a manner inconsistent with the terms of this Agreement. The access term for each flat panel screen shall be the same as that of the specific BTS subscription or Access Point to which it is attached.

6. <u>Uploaded Data</u>. Each time SR uses the Services, SR shall be deemed to represent and warrant to the SP Group that: (a) SR has all requisite right, power and authority and has obtained all requisite permissions, licenses and consents, and it is not a breach of any agreement to which SR is a party (in each case with respect to all Uploaded Data, including without limitation, the right, power and authority to make available Uploaded Data to SP Group, Related Persons and third parties) for any person to enable SP Group, Related Persons and third parties to receive, access, retrieve and/or use Uploaded Data, including for SP Group to provide, secure, manage, improve, and develop its services and products; (b) policies presented on the BTS may be incorporated by reference as part of this Agreement; and (c) the Uploaded Data does not infringe any intellectual property, proprietary, privacy or other right of any person. If, upon SR's request or at the direction of a Related Person, SP or its Affiliated Companies provide any Uploaded Data to any person, SR agrees that such provision of Uploaded Data does not violate any obligation SP owes to SR. SR shall not upload to the Services, or permit any person to upload on behalf of SR, any Information or other data or information obtained in connection with any other product offered or made available by SP or its Affiliated Companies. SR authorizes SP Group to access, use, process, classify, track and/or analyze (which, in each case, may involve data identification, extraction, analytics tools and models) Uploaded Data in order to provide, secure, manage, improve and develop services and products of SP Group. If SR provides Uploaded Data in the form of prices or ratings to the SP Group or inputs or uploads prices or ratings into any product or service provided by the SP Group, SR hereby grants to the SP Group, and SP hereby accepts, a nonexclusive, worldwide license for the SP Group to use such prices or ratings in the SP Group's generic, "fair value," composite or theoretical prices or ratings, or other similar pricing or rating models, and in the development and distribution of the Services.

7. <u>Warranties and Limitations of Liability</u>. (a) Each time SR uses the Services, SR shall be deemed to represent, warrant and covenant to the SP Group that: (i) it has all requisite regulatory and legal authority to enter into and be bound by this Agreement; (ii) its use of the Services (including any Uploaded Data) complies with all applicable laws, rules and regulations; and (iii) its use of the Services (including any Uploaded Data) will not cause the SP Group to be in violation of any law, rule or regulation.

(b) Nothing in the Services shall constitute or be construed as an offering of financial instruments or as investment advice or investment recommendations (i.e., recommendations as to whether or not to "buy", "sell", "hold", or to enter or not to enter into any other transaction involving any specific interest or interests) by the SP Group or a recommendation as to an investment or other strategy by the SP Group. No aspect of the Services is based on the consideration of SR's individual circumstances, and data and other information available via the Services should not be considered as information sufficient upon which to base an investment decision. The SP Group does not express an opinion on the future or expected value of any security or other interest and does not explicitly or implicitly recommend or suggest an investment strategy of any kind. The Services are not and shall not be construed as tax, legal, investment or accounting advice.

(c) SP Group makes no warranty, express or implied, as to results to be attained from the Services or the Equipment, and there are no express or implied warranties of merchantability or fitness for a particular purpose or use. None of the SP Group or their Suppliers guarantees or makes any representation as to the correctness or completeness of any part of the Services. To the maximum extent permitted by law, the SP Group shall not be responsible for or have any liability for any injuries, damages, delays or interruptions caused by the Equipment or the Services, from whatever cause, and shall not be liable for damages arising from the use or presence of the Equipment on SR's premises. SR is solely responsible for the accuracy and adequacy of the data and information used by it and the resultant output thereof.

(d) To the maximum extent permitted by law, none of the SP Group, its and their Suppliers and its and their third-party agents shall have any responsibility or liability whatsoever, contingent or otherwise, for any injury or damages, whether or not caused by the negligence of the SP Group or any of its and their employees, Suppliers, subcontractors, agents or vendors, arising in connection with the Services (however accessed) or the Equipment, including any data input by SR and shall not be liable for any lost profits, losses, punitive, incidental or consequential damages or any claim against SR by any other party.

(e) SP, to the best of its ability, shall maintain and keep the Equipment in good working order and condition so that it will perform its functions satisfactorily. Notwithstanding the foregoing, the SP Group shall have no responsibility or liability for the third-party communications network through which SR accesses the Services and SR shall indemnify the SP Group and hold them harmless against any loss arising in connection with the use of such third-party communications network. SR shall be responsible for the safekeeping of the Equipment from the time it is received on SR's premises and shall take reasonable steps to prevent abuse to the Equipment. SR shall be responsible for all physical loss, theft, or damage to any Equipment and shall pay SP the full replacement cost of the Equipment as liquidated damages unless such loss, theft, or damage is due entirely to the fault or negligence of SP. SP shall have all rights with respect to the Equipment provided by SP. To the maximum extent permitted by law, none of the SP Group, its or their Suppliers or third-party agents shall be responsible or liable, contingently or otherwise, for any personal injury or property damage arising out of the installation, relocation, maintenance, use or removal of the Services and/or the Equipment.

(f) Notwithstanding anything to the contrary in this Agreement, to the maximum extent permitted by law, the aggregate liability of SP and SP's Associated Persons hereunder or in connection with the Services or the Equipment shall not exceed the fees paid by SR for the Services during the three calendar months immediately preceding the first incurrence of damages by SR, and this shall be SR's exclusive remedy.

(g) No party shall be liable to the other for any default (other than payment default) resulting from *force majeure*, which includes any

circumstances beyond the reasonable control of the parties and regardless of form, arising out of or pertaining to any of the Services or the Equipment may be brought by SR more than one year after the cause of action has accrued. This Agreement shall not limit any liability for death or personal injury directly resulting from negligence if and to the extent such limitation would violate applicable law.

(h)  In addition to the indemnification obligations set forth in paragraph 7(e) above, SR shall indemnify, hold harmless and at SR's expense defend SP, SP's Associated Persons against any Loss arising in connection with a breach of this Agreement by SR or in connection with (i) use of the Services (including any Uploaded Data) by SR or (ii) use of any services by SR that are related to the Services (including without limitation any Uploaded Data or App Portal) and provided to SR by any third party.

(i)  Notwithstanding any limitations contained in paragraphs 7(b)-(h) to the contrary, but subject to SR's compliance with this Agreement, SP will indemnify, hold harmless and, at SP's expense, defend SR against any third-party claim that the Services provided by SP hereunder infringe any copyright, trademark or other intellectual property rights; provided that: (i) SR shall promptly notify SP in writing of the claim; (ii) SP shall have sole control of the settlement and defense of any action related to this indemnity; (iii) SR shall cooperate in every reasonable way to facilitate such defense; and (iv) if SR becomes aware of any suspected infringement by a third party of any proprietary rights of SP, SR shall promptly notify SP of such activities. Notwithstanding anything to the contrary in this paragraph 7(i), SP shall not indemnify SR for any claim to the extent it arises from or in connection with any: (A) App, App User Data or Uploaded Data; (B) additions, changes or modifications to the Services effected by any person other than a member of the SP Group; (C) incorporation of the Services into any product or service not provided by the SP Group; (D) use of the Services not in accordance with this Agreement; or (E) third party with whom SR has a direct agreement.

(j)  SP shall attempt to resolve any inquiries of SR regarding Connectivity Services provided by SP to SR used in accessing SP's Services. Notwithstanding any provision in this Agreement or any Schedule, SP Group is not responsible or liable for the availability or reliability of any such Connectivity Services which SP Group secures from a third party or for any act or omission of such third party furnishing any elements or portions of such connectivity services. Unauthorized use of, access to or resale of such Connectivity Services is prohibited.   SP GROUP MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO SUCH CONNECTIVITY SERVICES AND DISCLAIM ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE OF SUCH CONNECTIVITY SERVICES.

8.  Compliance and Other Considerations.

(a) Reputational and Operational Considerations.  SR represents, warrants and covenants to SP and its affiliates that none of SR or any person who acts on behalf of or at the direction of SR shall use (or enable others to use) the Services or anything created using the Services in connection with activities: (i) relating to nuclear, chemical or biological weapons proliferation, terrorism, corruption, undermining of democratic rights and government, money laundering, tax evasion or human rights violations, or other similarly egregious activities; or (ii) in, or for the benefit of, Crimea, Syria, Cuba, North Korea, or Iran (each, an "Excluded Jurisdiction").

(b) Economic Sanctions and Export Controls.  Notwithstanding any other provision of this Agreement, SP does not represent that the Services or anything created using the Services are appropriate or available for use in any particular location or for any or all purposes. SR represents, warrants and covenants to SP and its affiliates that none of SR or any person who acts on behalf of or at the direction of SR shall use (or enable others to use) the Services or anything created using the Services in connection with activity: (i) in, or for the benefit of, any country or region with respect to which the United Nations, United States, European Union and/or United Kingdom (the "Sanctioning Authorities") maintains sanctions prohibiting all or substantially all shipment or provision of services, goods, technology or software (a "Sanctioned Jurisdiction"); (ii) to, or for the benefit of, the government of an Excluded Jurisdiction or a Sanctioned Jurisdiction or a person located in or normally resident of an Excluded Jurisdiction or a Sanctioned Jurisdiction; (iii) involving or benefiting a government or person whose assets a Sanctioning Authority has blocked or to which a Sanctioning Authority restricts the shipment or provision of services, goods, technology or software (a "Prohibited Party"); (iv) to the extent applicable, for the purpose of transacting in, providing financing for, or otherwise dealing in prohibited equity or debt of, or extending credit to, persons identified by (or owned or controlled, whether individually or in aggregate, by persons identified by) any Sanctioning Authority as being subject to sanctions prohibiting such activities; or (v) for any purpose that would be prohibited under the economic sanctions of any Sanctioning Authority. Each time SR receives or uses the Services or anything created using the Services, SR shall be deemed to represent and warrant to SP and its affiliates that none of SR or any person who acts on behalf of or at the direction of SR or any person on whose behalf SR is acting, is: (i) located in, normally a resident of, or the government of, any Excluded Jurisdiction or Sanctioned Jurisdiction; or (ii) a Prohibited Party.

9.  Remedies.  The parties acknowledge that a breach or threatened breach of this Agreement by any SR or any of its Related Persons would cause irreparable harm to SP that could not be adequately relieved by monetary damages only. The parties therefore intend and agree that if such breach or threatened breach occurs, SP shall be entitled to injunctive relief to enforce the provisions hereof, but nothing herein shall preclude SP from pursuing any action or other remedy for any breach or threatened breach of this Agreement, all of which shall be cumulative. If SP prevails in any such action, SP shall be entitled to recover from SR all reasonable costs, expenses and attorneys' fees incurred in connection therewith.   As reasonable protection of the proprietary rights of SP and others in the information provided through the Services and Equipment, to avoid breach of SP's obligations to Suppliers of such information, and to avoid unnecessary uncertainty, burden, and expense for all parties, SR acknowledges and agrees that the dissemination by SR of information identical or similar to that provided through the Services and the Equipment shall be deemed a breach of the Agreement and shall give rise to SP's immediate right to terminate this Agreement or any portion of the Services.

10.  Parties.  SR recognizes that the SP Group, its respective partners and Suppliers (including each of their affiliates), each have rights with respect to the Services, including the software, data, information and other items provided in connection with or by reason

of SR's use of the Services, and the probable enforcement against SR of any of such persons and their respective affiliates, successors, assigns, officers, directors, employees and representatives.

11. Facilities. Provision of the Services is contingent on the availability of the hardware, network access, connectivity services, communications equipment and facilities to SP's specifications. At SR's expense, SR shall install or have installed on SR's premises, and shall modify from time to time at SP's request, all cables, wires, devices, connections or other transmission media equipment and electrical, communications and network connections specified by SP. SR shall not make use of any software, cables, wires, devices, connections, connectivity, equipment or network access in connection with the Services not approved in writing by SP. Installed Equipment shall not be relocated by any person without SP's consent. On reasonable prior written notice from SR, which shall in no event be less than 60 days, and at SR's expense, SP shall relocate Services and/or Equipment at SR's request. Scheduling of such relocation shall be contingent on availability of communication lines, facilities, equipment and labor. SR acknowledges that interruptions of Services might result from such relocation and that the limitations of SP's liability in paragraph 7 shall apply to any such interruption. Any person designated by SP shall have access to the Equipment at all reasonable times for the purposes of installation, inspection, maintenance, repair, relocation and removal.

12. Monitoring and Audit. (a) The SP Group may monitor, either physically or electronically (including remotely), SR's use of the Services. Suppliers of Additional Information may monitor, either physically or electronically, SR's use of applicable Additional Information. Monitoring may include monitoring of SR's requests for Information for purposes of verifying SR's compliance with this Agreement and maintaining and improving SP's provision of Services, including without limitation for purposes of troubleshooting, maintenance, data management, information security, capacity planning and service improvement. SR shall at all reasonable times permit SP to have access to the location where the Services are provided for the purpose of ascertaining the use made of the Services.

(b) The SP Group may audit SR's compliance with the terms of this Agreement and the Schedule(s) and use of the Services at any time. In addition, Suppliers of Additional Information may audit SR's use of applicable Additional Information at any time. SR shall allow the SP Group, Suppliers of Additional Information and any third party designated by SP access to SR's premises, Systems, Receiving Devices and Related Persons at all reasonable times for the purpose of such auditing. Upon the request of SP or a Supplier of Additional Information, SR shall make a management employee available to assist with the auditing and/or monitoring permitted herein. In addition, from time to time upon SP's request, SR shall promptly demonstrate to SP's reasonable satisfaction that SR is in full compliance with this Agreement and any Schedule(s). In addition to any rights the SP Group and Suppliers of Additional Information have pursuant to this paragraph 12, at SP's request, SR shall provide SP with written descriptions and other information as SP may request with respect to any and all applications used by SR that accept Information as inputs and/or interface with any Services.

(c) SR agrees that if SR is in breach of this Agreement or is using the Services in a manner not permitted by this Agreement, (i) SR shall be liable to pay applicable additional charges and/or Additional Information Fees, such charges or fees to be calculated from the day of actual installation of the initial Services, and (ii) without limiting any other remedy available to SP, SP shall have the right to terminate this Agreement, one or more Schedules and/or any portion of the Services provided hereunder.

13. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the United States and the State of New York regardless of the substantive law that might otherwise govern under applicable choice-of-law principles. The parties hereto, their successors and assigns, agree to submit to the exclusive jurisdiction of the federal and state courts located in New York County, New York in connection with any matters arising out of or relating to this Agreement and waive all objections to the selection of such venue or to such courts' assertion of jurisdiction over the parties regarding such matters, including without limitation on the grounds of forum non conveniens and sovereign immunity.

14. Miscellaneous. SR shall not use any of the SP Group's trademarks, trade names, or service marks in any manner during and after the Term without SP's prior written consent, and SR acknowledges that it has no ownership rights in and to any of these names and marks. SP may delegate certain of its responsibilities, obligations and duties hereunder to a third party or an Affiliated Company for discharge of those responsibilities, obligations and duties on SP's behalf. SR shall have the right to assign this Agreement or the rights hereunder only with SP's written consent. For purposes of the foregoing sentence, a transfer of a controlling interest in SR shall be considered an assignment and SP shall have the right to terminate this Agreement and Schedules executed hereunder upon any such transfer. SP shall have the right to assign this Agreement or the rights hereunder to any Affiliated Company without the consent of SR. This Agreement is the entire agreement between the parties as to the subject matter hereof and supersedes any oral or written communications or representations or agreements relating thereto. No changes, modifications or waivers regarding this Agreement shall be binding unless in writing and executed by the parties hereto. For inquiries, please contact Bloomberg L.P., operating agent of Bloomberg Finance L.P., at 731 Lexington Avenue, New York, NY 10022, Telephone: (212) 318-2000, Facsimile: (917) 369-5540, or any successor operating agent or other party as specified by Bloomberg Finance L.P. from time to time. For information about communications tools and records, see BMAI <GO> on the BTS. The Privacy Notice applicable to personal information is available at PCPN <GO> on the BTS. SP and SR intend this Agreement to be a valid legal and enforceable instrument. If any provision herein is found invalid or unenforceable, that provision shall be enforced to the maximum extent permissible, and the other provisions shall remain in force. Headings are solely for the convenience of the parties and have no legal or contractual significance. This Agreement, including any Schedules, and any related modifications, waivers or notifications may be executed and delivered by facsimile, electronic mail, or other electronic means, including via a website designated by SP by completing the procedures specified on that website. Any such facsimile, electronic mail transmission, or communication via such electronic means shall constitute the final agreement of the parties and conclusive proof of such agreement, and shall be deemed to be in writing and to have the same effect as if signed manually. SR agrees it has the ability to store information delivered to SR electronically so that it remains accessible to SR in

an unchanged form. Paragraphs 2, 3(c), and 7-14 survive such termination and shall continue in full force and effect.

Agreed to by:
**GOLDEN ISLES TECHNOLOGY PENSION GROUP TRUST**
Company Name

_[signature]_
Signature (Duly authorized signatory, officer, partner or proprietor)

BERNARD V. TEW
Name (Please type or print)

POA
Title (Please type or print)

9/8/2021
Date

Agreed to by:
**BLOOMBERG FINANCE L.P.**
By: BLOOMBERG (GP) FINANCE LLC.
    General Partner

_[signature]_
Signature of Authorized Signatory

9/8/2021
Date

The following are trademarks and service marks of Bloomberg Finance L.P. a Delaware limited partnership, or its subsidiaries: BLOOMBERG, BLOOMBERG ANYWHERE, BLOOMBERG MARKETS, BLOOMBERG NEWS, BLOOMBERG PROFESSIONAL, BLOOMBERG TERMINAL and BLOOMBERG.COM. Absence of any trademark or service mark from this list does not waive Bloomberg's intellectual property rights in that name, mark or logo. All rights reserved.   800808003.3

_Dnaa Valentian_

9/8/2021

"Access Point" means locally-installed SP-provided software used by SR to access the BTS.

"Additional Information" means data and information sourced from exchanges and other information providers (other than the SP Group), in each case that is included in the Information.

"Additional Information Fees" has the meaning given to such term in paragraph 3(a).

"Affiliated Companies" means those companies controlling, controlled by or under common control with SP.

"Agreement" means this Agreement and expressly includes any and all amendments, addenda or Schedules hereto.

"App" means a software application (including any software or data related thereto) for use in conjunction with the BTS identified in App Portal.

"App Portal" means the Bloomberg Application Portal, as it may be updated by SP from time to time on the BTS. App Portal is accessible via the BTS function APPS <GO> (or its replacement function).

"App User Data" means any information or data (other than Information) that is provided, input or uploaded by a Terminal User or BBA User in connection with an App.

"Authorized Computer" means a computer of SR meeting the designated technical specifications provided by SP from time to time equipped with a keyboard supplied by the SP Group and/or other non-server desktop computers of SR that contain configured software provided by SP or its affiliates that enable users to log onto the BTS.

"BBA User" means a Related Person who has access to the Services through a Bloomberg Anywhere subscription to the BTS.

"Bloomberg Anywhere" means the user-based subscription to the BTS which enables a single authorized Related Person to access data and information through the BTS on any Receiving Device.

"Bloomberg Terminal" means the device-based subscription to the BTS which enables Related Persons to access data and information through the BTS on only one specific Receiving Device.

"BTS" is defined in paragraph 1.

"Connectivity Services" shall mean SP-managed connectivity services and/or access permissions to the Bloomberg network or Information, including without limitation communications circuits and facilities, cloud, internet, and other transmission- or access-related networks, and any applicable installations, maintenance, managed services, or upgrades thereof.

"Designated Authorized Computer" means, with respect to any Downloaded Information, the Authorized Computer that received such Downloaded Information.

"Desktop API" means the Bloomberg Application Program Interface (or any successor thereof) for desktop use in association with Bloomberg Terminal and/or Bloomberg Anywhere subscriptions to the BTS.

"Downloaded Information" means Information received via the Desktop API or otherwise downloaded, copied or exported from the BTS (including, for the avoidance of doubt, any screenshots downloaded or copied from the BTS) and any Resultant Information or related Resultant Information created or derived therefrom.

"Equipment" means equipment (including any software installed therein) made available by the SP Group in connection with the Services.

"Excluded Jurisdiction" is defined in paragraph 8(a).

"Information" means: (a) all data and other information made available by SP or an Affiliated Company to SR (including all data calculated or derived by SP or an Affiliated Company) that is downloaded, accessed or otherwise imported or received by SR that is not governed by a specific agreement (other than this Agreement) between SP and SR; and (b) any data derived, calculated or reformatted by or on behalf of SR from such data identified in subclause (a) above excluding any and all Resultant Information. Information includes all Additional Information and all Downloaded Information.

"Items" means the Information, Materials and SR-Developed Applications.

"Limited Amount" means a limited amount or type of Information, Resultant Information or related Resultant Information that, evaluated quantitatively and/or qualitatively, in SP's sole judgment, does not affect SP's ability to exploit the Information or the ability of any Supplier or source of any part of such Information to exploit such part of the Information or in each case to realize revenue in connection therewith.

"Loss" means any loss, claim, demand or expense (including reasonable attorneys' fees).

"Materials" means any development and other materials that SP may make available to SR from time to time, which may include without limitation: (i) development templates and tools including the files, software, documentation and/or other materials that provide SR with the tools to develop, modify, enhance and/or upgrade SR-Developed Applications; (ii) any other applications, software, files, materials, documentation or other items made available for development purposes or otherwise in connection with the Services; and (iii) simulations software.

"Network Access" means connectivity to the Bloomberg network, including without limitation communications circuits and facilities and any applicable installations or upgrades thereof.

"Prohibited Party" is defined in paragraph 8(b).

"Receiving Device" means any non-server device (such as a desktop computer, laptop computer, tablet or phone) through which a user downloads, accesses or otherwise receives Information from the BTS. In addition, for BBA Users only, "Receiving Device" shall also include any device on which a BBA User re-accesses Information in accordance with this Agreement.

"Related Persons" means (a) all SR employees and (b) all temporary workers, contractors or consultants contracted for

by SR that provide substantially full-time services of the type that are customarily performed by SR's employees, and who are subject to substantially the same terms and conditions as an employee of SR, and who use the Services primarily on SR's premises and only for the benefit of SR.

"Resultant Information" means data or information that is the output of calculations or analysis performed by or on behalf of SR using Information, provided that such Information used in such calculation or analysis does not, in SP's good faith judgment, remain identifiable in, and may not be readily extracted or reverse-engineered from, such output. References to "related Resultant Information" shall mean with respect to any given Information, Resultant Information that is derived or results from use of such Information.

"Sanctioned Jurisdiction" is defined in paragraph 8(b).

"Sanctioning Authorities" is defined in paragraph 8(b).

"Schedule" means a Bloomberg Schedule of Service or other schedule (however titled) entered into in connection with this Agreement.

"Schedule Term" is defined in paragraph 2(a).

"Services" includes the BTS, all items listed on the attached Schedule(s) and all SP-provided software associated with the foregoing.

"SP" is defined in the introductory paragraph of this Agreement.

"SP Group" means SP and the Affiliated Companies.

"SP's Associated Persons" means Affiliated Companies of SP and the partners, Suppliers, successors and assigns of SP and its Affiliated Companies and their respective officers, directors, employees and representatives.

"SR" is defined in the introductory paragraph of this Agreement.

"SR-Developed Applications" means applications developed or modified by or on behalf of SR that (i) are derived from, contain elements of, or use intellectual property contained in, the Materials or (ii) accept the Information or Resultant Information as inputs.

"SR Equipment" means hardware or other equipment not provided by SP and used by SR in connection with the Services.

"Suppliers" means suppliers or sources of SP and/or its Affiliated Companies, information sources, providers of Additional Information or software and all other parties that provide, or have any rights in, any portion of the Services.

"Systems" means Receiving Devices and any software, hardware or other equipment or services used by SR to receive, store, analyze, manipulate or process the Information.

"Term" is defined in paragraph 2(a).

"Terminal User" means, with respect to a Bloomberg Terminal subscription, each Related Person who has access to the Services through a login to a Bloomberg Terminal subscription.

"Uploaded Data" means information or data provided by or on behalf of SR to SP and/or its Affiliated Companies, or input or

on behalf of SR (or any Terminal User or BBA User) into the Services, including for the avoidance of doubt, any App User Data.

"User" means a BBA User or a Terminal User.